390 S.E.2d 568

**Joseph DOTTS**

v.

**TARESSA J.A., et al., Fairmont Marion County Transit Authority, a Public Corporation, and Buckeye Union Insurance Company.**

No. 19124.

Supreme Court of Appeals of West Virginia.

Feb. 23, 1990.

David L. Solomon and Michael L. Solomon, Solomon & Solomon, Morgantown, for Buckeye Union Ins. Co.

Kevin V. Sansalone, Fairmont, for Joseph Dotts.

MILLER, Justice:

The Circuit Court of Marion County, by summary judgment, decided that Buckeye Union Insurance Company (Buckeye) was required to provide coverage, under a liability policy it had issued to the Fairmont Marion County Transit Authority (Transit Authority), to Joseph Dotts, an employee of the Transit Authority, for damages resulting from his sexual assault of a passenger. There is no dispute that Mr. Dotts committed the sexual offense against the infant plaintiff while she was a passenger on the bus he was driving.[1]

## I.

### Policy Provision

The business auto liability insurance portion of Buckeye's policy obligated it to "pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an *accident* and resulting from the ownership, maintenance or use of a covered auto." (Emphasis added). The term "accident" is defined in the policy as follows: "Accident includes continuous or repeated exposure to the same conditions resulting in bodily injury or property damage the *insured neither expected or intended.*" (Emphasis added).

█ We recently considered an analogous factual situation in *Horace Mann Ins. Co. v. Leeber,* 180 W.Va. 375, 376 S.E.2d 581 (1988). In that case, the insurance policy contained the following express exclusion for damages arising from an intentional injury: " 'This policy does not apply to liability ... caused intentionally by or at the direction of any insured[.]' " 180

Paul E. Parker, III and Charles A. Shields, Rose, Padden & Petty, Fairmont, for Teri J., James A. and Taressa J.A.

1. Mr. Dotts pleaded guilty to one count of sexual abuse in the first degree and was given a sentence of one-to-five years in the penitentiary. Additionally, he pleaded guilty to a battery charge and was given twelve months in the Marion County jail.

W.Va. at 377, 376 S.E.2d at 583. We concluded in the Syllabus of *Leeber* that such exclusion foreclosed coverage for sexual misconduct on the part of an insured: [2]

"There is neither a duty to defend an insured in an action for, nor a duty to pay for, damages allegedly caused by the sexual misconduct of an insured, when the liability insurance policy contains a so-called 'intentional injury' exclusion. In such a case the intent of an insured to cause some injury will be inferred as a matter of law."

We arrived at this conclusion after an extensive review of the law in this area and summarized the underlying rationale of the "no coverage" rule as follows:

"The majority of the jurisdictions deciding these questions hold that there is neither a duty to defend nor to pay under such circumstances. Most courts deny liability insurance *coverage* for alleged sexual misconduct by applying an objective test to an intentional injury exclusion in the policy. They hold that the insured must have intended not only the act (the alleged sexual contact) but also must have intended to cause *some* kind of *injury*. However, the intent to cause some injury will be *inferred* as a matter of *law* in a sexual misconduct liability insurance case, due to the nature of the act (the alleged sexual contact), which is so *inherently* injurious, or 'substantially certain' to result in some injury, that the act is considered a criminal offense for which public policy precludes a claim of unintended consequences, that is, a claim

that *no* harm was intended to result from the act." 180 W.Va. at 378–379, 376 S.E.2d at 584–85. (Emphasis in original; footnote omitted).

The plaintiff, while acknowledging *Leeber*, seeks to distinguish it on the ground that the Buckeye policy does not have an express exclusion for intentional torts. Buckeye responds that its definition of the term "accident," which is limited to "bodily injury or property damage the *insured neither expected or intended*," does not cover damages resulting from intentional torts such as sexual assaults. (Emphasis added). If such damages do not fall within the "accident" definition, there is no coverage or duty to defend.

There is a rather lengthy annotation at 31 A.L.R.4th 957 (1984), collecting cases that deal with policy language excluding coverage for injuries intended or expected by the insured. The annotator points out that this language attempted to clarify and replace the intentional injury exclusion by limiting the term "accident" for coverage purposes to those actions of the insured that were neither expected nor intended. This language was also designed to focus the evaluation of the event on the perspective of the insured rather than on that of the injured victim. Annot., 31 A.L.R.4th at 972. *See Patrons–Oxford Mut. Ins. Co. v. Dodge*, 426 A.2d 888, 891 (Me.1981).

◼ There does appear to be general agreement that this language is the equivalent of the intentional tort exclusion.[3] Consequently, we conclude that language in a motor vehicle liability insurance policy de-

---

**2.** There is no dispute in this case that since Mr. Dotts was driving the bus with the consent of the Transit Authority, he was an insured under the policy.

**3.** *See Continental Ins. Co. v. McDaniel,* 160 Ariz. 183, 772 P.2d 6 (App.1988); *CNA Ins. Co. v. McGinnis,* 282 Ark. 90, 666 S.W.2d 689 (1984); *State Farm Fire & Casualty Co. v. Robin R.,* 216 Cal.App.3d 132, 264 Cal.Rptr. 326 (1989); *McCullough v. Central Florida YMCA,* 523 So.2d 1208 (Fla.App.1988); *Roe v. State Farm Fire & Casualty Co.,* 259 Ga. 42, 376 S.E.2d 876 (1989); *Harpy v. Nationwide Mut. Fire Ins. Co.,* 76 Md. App. 474, 545 A.2d 718 (1988); *Terrio v. McDonough,* 16 Mass.App. 163, 450 N.E.2d 190, 31 A.L.R.4th 943, *review denied,* 390 Mass. 1102,

453 N.E.2d 1231 (1983); *Auto–Owners Ins. Co. v. Gardipey,* 173 Mich.App. 711, 434 N.W.2d 220 (1988); *Horace Mann Ins. Co. v. Independent School Dist. No. 656,* 355 N.W.2d 413 (Minn. 1984); *Vermont Mut. Ins. Co. v. Malcolm,* 128 N.H. 521, 517 A.2d 800 (1986); *Chemung County v. Hartford Casualty Ins. Co.,* 130 Misc.2d 648, 496 N.Y.S.2d 933 (1985); *State Farm Fire & Casualty Co. v. Reuter,* 294 Or. 446, 657 P.2d 1231 (1983); *Rodriguez v. Williams,* 107 Wash.2d 381, 729 P.2d 627 (1986); *N.N. v. Moraine Mut. Ins. Co.,* 153 Wis.2d 84, 450 N.W.2d 445 (1990); *K.A.G. v. Stanford,* 148 Wis.2d 158, 434 N.W.2d 790 (App.1988), *review denied,* 439 N.W.2d 142 (Wis.1989).

fining "accident" to include "bodily injury or property damage the insured neither expected or intended" is generally designed to exclude coverage for an intentional tort such as sexual assault.

## II.

*Safety Responsibility Law*

A more viable argument advanced by the plaintiff is that an intentional tort policy exclusion is not valid with respect to the mandatory insurance provisions of our Safety Responsibility Law. W.Va.Code, 17D–1–1, *et seq.* This act requires mandatory automobile liability insurance in the amount of $20,000 for bodily injury to or death of any one person and $40,000 for any one accident. W.Va.Code, 17D–2A–3 (1982);[4] W.Va.Code, 17D–4–2 (1979).[5]

### A.

█ None of the parties raises the initial question of whether the Transit Authority is subject to the Safety Responsibility Law. W.Va.Code, 17D–2A–2 (1982), exempts from its provisions "motor vehicles owned by the State, any of its political subdivisions or by the federal government." *See also* W.Va.Code, 17D–2A–3; W.Va.Code, 17D–6–1. The Transit Authority was created pursuant to W.Va.Code, 8–27–1, *et seq.*, the Urban Mass Transportation Authority Act, which permits municipalities and contiguous counties to create a transit authority. The entity so created has a governing board selected by the participating governmental entities, and has the right to sue and be sued, the power of eminent domain, and fairly extensive powers to operate a local transit system, including the right to issue revenue bonds.

W.Va.Code, 8–27–5 (1971); W.Va.Code, 8–27–10 (1976).

The question of what type of an entity is a political subdivision of the state is not susceptible to a general formulation. It often depends on the statute in which the term is used. The term may be defined in a particular statute for purposes of that enactment. *See* W.Va.Code, 5–10–2(4) (1988) (Public Employees Retirement Act); W.Va.Code, 5–10C–3(7) (1989) (governmental employees retirement plans); W.Va. Code, 6A–1–3(e) (1961) (Emergency Interim Executive and Judicial Succession Act); W.Va.Code, 12–6–2(7) (1983) (Investment Management Law); W.Va.Code, 15–5–2(d) (1978) (emergency services); W.Va.Code, 29–12A–3(c) (1986) (Governmental Tort Claim and Insurance Reform Act).

Here, however, the term "political subdivision" is not statutorily defined, and, consequently, we resort to our case law interpretation of the term. In *Kucera v. City of Wheeling*, 153 W.Va. 531, 170 S.E.2d 217 (1969), we addressed the question of whether a municipality was a political subdivision of the state under a general statutory phrase similar to the one here.[6] We recognized that a municipality was a political subdivision of the state because it was created by the state and was authorized to exercise part of the state's police powers. More importantly, as to what constituted a political subdivision, we quoted with approval this statement from *Dugas v. Beauregard*, 155 Conn. 573, 578, 236 A.2d 87, 89 (1967):

" 'The attributes which are generally regarded as distinctive of a political subdivision are that it exists for the purpose of discharging some function of local government, that it has a prescribed area, and that it possesses authority for

---

**4.** This section was revised in 1988, after the date of the incident in this case. The revisions were rather minor, and the minimum insurance requirement remains the same. *See* 1988 W.Va. Acts, ch. 91.

**5.** We discussed the history of our Safety Responsibility Law in *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co.,* 181 W.Va. 609, 383 S.E.2d 791 (1989). In *Jones v. Motorists Mut. Ins. Co.,* 177 W.Va. 763, 356 S.E.2d 634

(1987), we held that a named driver exclusion endorsement in a motor vehicle liability insurance policy was of no force or effect up to the minimum coverage required by the statute.

**6.** *Kucera* dealt with overtime pay for firemen. Under W.Va.Code, 21–5C–1 (1966), the term "employer" was defined as including "the state of West Virginia, its agencies, departments and all its political subdivisions[.]"

subordinate self-government through officers selected by it.'" 153 W.Va. at 536, 170 S.E.2d at 220.

We addressed a statutorily created entity in *Queen v. West Virginia Univ. Hospitals, Inc.,* 179 W.Va. 95, 365 S.E.2d 375 (1987). The legislature had created a public hospital corporation with a designated board of directors and revenue bonding authority. In note 5 of *Queen,* 179 W.Va. at 103, 365 S.E.2d at 383, we stated that "[t]he phrase 'political subdivision' is a term of art used with varying degrees of application in numerous statutes." We concluded that the hospital was not a political subdivision.

It would seem that in the absence of any statutory definition, the chief hallmark of a political subdivision, as we indicated in *Kucera,* is "an incorporation of inhabitants of a specified area for purposes of local government." 153 W.Va. at 537, 170 S.E.2d at 220. Such an incorporation will necessarily involve legislative authorization and will result in delegation of certain powers which are traditionally an attribute of the state's sovereign powers. When these conditions exist, the entity becomes a political subdivision of the state.

We do not find such conditions to exist here. The Transit Authority, while legislatively authorized, does not involve the feature of any self-government in the traditional political sense by the general inhabitants of the locality where it operates. Its exercise of power is for an extremely limited purpose, i.e., a transit system, much like the public hospital corporation in *Queen, supra.* We, therefore, conclude that a transit authority created under W.Va.Code, 18–27–1, *et seq.,* is not a political subdivision of the state within the meaning of W.Va.Code, 17D–2A–2. The Transit Authority's motor vehicle liability insurance policy is, therefore, subject to the provisions of our Safety Responsibility Law, W.Va.Code, 17D–2A–1, *et seq.*

### B.

■ It appears that a majority of those jurisdictions that have considered the issue have concluded that a mandatory insurance policy required by a safety responsibility statute will override an automobile liability policy exclusion for an intentional tort.[7] Typical of these cases is *South Carolina Farm Bureau Mut. Ins. Co. v. Mumford,* 299 S.C. 14, 382 S.E.2d 11 (App.1989), where the defendant policy holder had deliberately attempted to kill herself by driving her vehicle across the highway into the path of an oncoming truck. The truck driver sought to collect damages, and the defendant's insurance carrier denied coverage under the policy's intentional tort exclusion.

The court in *Mumford* concluded that South Carolina's Financial Responsibility Act imposed coverage up to the statutorily mandated amount of insurance.

"The statute requires any automobile insurance policy issued in this State to insure against 'loss from liability imposed by law' for damages arising out of the use of a covered motor vehicle.... It draws no distinction between intentional acts and negligent acts of the insured—if liability for damages is 'imposed by law,' coverage must be provided. Without question, the law imposes liability on one who intentionally uses an automobile in a manner that causes damage to another.... Therefore, by the plain terms of the statute, the insurance policy must provide coverage for [the injured party's] damages." 299 S.C. at 16–17, 382 S.E.2d at 13. (Citations omitted).

---

7. *State Farm Fire & Casualty Ins. Co. v. Tringali,* 686 F.2d 821 (9th Cir.1982) (applying Hawaii law); *Martin v. Chicago Ins. Co.,* 184 Ga.App. 472, 361 S.E.2d 835 (1987); *Mosley v. West American Ins. Co.,* 743 S.W.2d 854 (Ky.App. 1987); *Wheeler v. O'Connell,* 297 Mass. 549, 9 N.E.2d 544, 111 A.L.R. 1038 (1937); *Cannon v.* *Commerce Ins. Co.,* 18 Mass.App. 984, 470 N.E.2d 805 (1984); *Hartford Accident & Indem. Co. v. Wolbarst,* 95 N.H. 40, 57 A.2d 151 (1948); *Nationwide Mut. Ins. Co. v. Roberts,* 261 N.C. 285, 134 S.E.2d 654 (1964); *South Carolina Farm Bureau Mut. Ins. Co. v. Mumford,* 299 S.C. 14, 382 S.E.2d 11 (App.1989).

We have similar language in our Safety Responsibility Law. W.Va.Code, 17D–4–12(b)(2) (1979), relating to the liability policy, states:

"[A motor vehicle owner's liability policy] [s]hall insure the person named therein and any other person, as insured, using any such vehicle or vehicles with the express or implied permission of such named insured, against *loss from the liability imposed by law* for damages arising out of the ownership, operation, maintenance or use of such vehicle[.]" (Emphasis added).

In the same section, this language is repeated with regard to an operator's policy of liability insurance: "[The policy] shall insure the person named as insured therein against *loss from the liability imposed upon him by law* for damages arising out of the use by him of any motor vehicle[.]" W.Va.Code, 17D–4–12(c). (Emphasis added).[8] Clearly, this language does not limit coverage to liability for damages arising out of negligence in an accident. It encompasses *any* "liability imposed upon [the insured] by law for damages" arising out of the use of a motor vehicle.

There is language in W.Va.Code, 17D–4–12(b)(2), referring to the amount of insurance coverage that must be obtained, which uses the term "accident." It is clear, however, that this term is utilized as a means of describing the minimum coverage requirements for any single accident.[9]

It is also noteworthy that subsection (e) of W.Va.Code, 17D–4–12, which specifies certain conditions or events which the financial responsibility insurance need not insure, does not mention intentional acts.[10] This leads us to conclude, under the doctrine of "expressio unius est exclusio alterius" (express mention of one thing implies exclusion of all others), that the legislature did not intend to exclude coverage for an intentional tort. We have reached a similar conclusion in applying this maxim to other statutory interpretations. *E.g., Committee on Legal Ethics v. Roark,* 181 W.Va. 260, 382 S.E.2d 313 (1989); *Manchin v. Dunfee,* 174 W.Va. 532, 327 S.E.2d 710 (1984).

Finally, we observe that under subsection (g) of W.Va.Code, 17D–4–12, there is a clear expression by the legislature that these more restrictive statutory conditions imposed under our financial responsibility law are not applicable to any excess insurance coverage provided in the policy.[11]

In addition to this particular statutory language, we have taken the general view that our financial responsibility statute is primarily designed to protect the members of the public, rather than the individual

---

8. The entire text of W.Va.Code, 17D–4–12(c), is:
   "Such operator's policy of liability insurance shall insure the person named as insured therein against loss from the liability imposed upon him by law for damages arising out of the use by him of any motor vehicle not owned by him, within the same territorial limits and subject to the same limits of liability as are set forth above with respect to an owner's policy of liability insurance."

9. The relevant phrase in W.Va.Code, 17D–4–12(b)(2), is:
   "shall insure ... subject to limits exclusive of interest and costs, with respect to each such vehicle, as follows: Twenty thousand dollars because of bodily injury or death of one person in any one accident and, subject to said limit for one person, forty thousand dollars because of bodily injury to or death of two or more persons in any one accident, and ten thousand dollars because of injury to or destruction of property of others in any one accident."

10. W.Va.Code, 17D–4–12(e), provides:
   "Such motor vehicle liability policy need not insure any liability under any workmen's compensation law nor any liability on account of bodily injury to or death of an employee of the insured while engaged in the employment, other than domestic, of the insured, or while engaged in the operation, maintenance or repair of any such vehicle nor any liability for damage to property owned by, rented to, in charge of, or transported by the insured."

11. W.Va.Code, 17D–4–12(g), provides:
   "Any policy which grants the coverage required for a motor vehicle liability policy may also grant any lawful coverage in excess of or in addition to the coverage specified for a motor vehicle liability policy and such excess or additional coverage shall not be subject to the provisions of this chapter. With respect to a policy which grants such excess or additional coverage the term 'motor vehicle liability policy' shall apply only to that part of the coverage which is required by this section."

insured.[12]  *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co., supra; Jones v. Motorists Mut. Ins. Co.,* 177 W.Va. 763, 356 S.E.2d 634 (1987).

We, therefore, conclude that an intentional tort exclusion in a motor vehicle liability insurance policy is precluded under our Safety Responsibility Law up to the minimum insurance coverage required therein. The policy exclusion will operate as to any amount above the statutory minimum.

### III.

### *Arising Out of the Ownership, Maintenance, or Use*

Buckeye asserts that even if coverage were available for intentional acts, Mr. Dotts would be excluded from coverage because the sexual offense did not arise out of the ownership, maintenance, or use of the vehicle as required by the insurance policy.[13]

We have not had occasion to determine what is meant by this language. It is apparent, however, that the phrase is not a restrictive one, since it contains three different operative words, i.e., "ownership," "maintenance," and "use." It is likewise apparent that these terms do not all relate to the same activities; in other words, they are not synonymous. The policy itself does not define them, and we have no need for purposes of this case to attempt a comprehensive definition of each term. It is sufficient if the event on which coverage is premised can fall within any one of these terms.

To begin the analysis, reason dictates that some inquiry be made of the event which is claimed to arise out of the use of the vehicle. Here, the bus driver had been accustomed to transporting school children, although we are not informed on the factual record before us of the exact arrange-

ments. It does appear that Mr. Dotts devised a plan to place candy in his trouser pocket and then encouraged the children to reach into his pocket to obtain the candy. In the course of doing this, he would cause the children to touch his penis.

Counsel for the plaintiff relies heavily on *Huntington Cab Co. v. American Fidelity & Casualty Co.,* 155 F.2d 117 (4th Cir. 1946), where the court found that an unprovoked assault by a cab driver on his passenger arose out of the ownership, maintenance, or use of the vehicle.

"These terms do not in our opinion require that the automobile itself produce the injury as is suggested in the decisions upon which the District Judge relied. They are equally satisfied if the injury is incidental to or grows out of the relationship of carrier and passenger which in this form of transportation necessitates personal dealings and contact between the driver and the passenger in the use of the cab." 155 F.2d at 120.

Buckeye counters with *Aetna Casualty & Sur. Co. v. United States Fidelity & Guar. Co.,* 806 F.2d 302 (1st Cir.1986), which involved the rape of a retarded girl by a bus driver. There, the court attempted to distinguish *Huntington Cab* on the ground that it involved state-mandated insurance for common carriers. The court in *Aetna* went on to point out that "[a]utomobiles are an indispensable part of many crimes, bank robberies for example, yet it would certainly be farfetched to say that these crimes result from the *use* of the automobile." 806 F.2d at 303. (Emphasis in original).

We do not disagree with this statement, but it hardly answers the question before us. This crime was committed on the bus while the driver was using the vehicle to transport the passenger against whom the sexual offense was committed.

---

**12.** The statute itself suggests this result, as illustrated by W.Va.Code, 17D–2A–1: "The purpose of this article is to promote the public welfare by requiring every owner or registrant of a motor vehicle licensed in this State to maintain certain security during the registration period for such vehicle."

**13.** The actual policy language is as follows: "We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by accident and resulting from the ownership, maintenance or use of a covered auto."

■ We are dealing with a common carrier which, under our law and general law elsewhere,[14] owes to its passengers the duty to use the highest degree of care to transport them safely. *Jones v. Perrine,* 175 W.Va. 111, 331 S.E.2d 842 (1985); Syllabus Point 2, *Abdulla v. Pittsburgh & Weirton Bus Co.,* 158 W.Va. 592, 213 S.E.2d 810, 89 A.L.R.3d 944 (1975). As a consequence of this elevated duty, courts generally hold that assaults made by employees on passengers arise out of the use or operation of the vehicle within the meaning of a motor vehicle liability insurance policy. This rule is set out in 6C J. Appleman & J. Appleman, *Insurance Law & Practice* § 4468 at 639 (1979):

> "Assaults committed on passengers by employees of a bus or taxicab company are usually considered as arising out of ownership, maintenance or use of the vehicle. Even where the driver did not actually commit the assault, but rather instigated an assault by another, the carrier has been held liable. And where a taxi driver was aware that his passenger had a gun, and afterwards picked up a girl, who was injured by a discharge of the gun during the absence of driver, such injury was covered by the liability policy." (Footnotes omitted).

*See, e.g., Connell v. Clark,* 88 Cal.App.2d 941, 200 P.2d 26 (1948); *American Casualty Co. v. Southern Stages, Inc.,* 70 Ga.App. 22, 27 S.E.2d 227 (1943); *Maryland Casualty Co. v. Baker,* 304 Ky. 296, 200 S.W.2d 757 (1947); *Suburban Serv. Bus Co. v. National Mut. Casualty Co.,* 237 Mo.App. 1128, 183 S.W.2d 376 (1944); *Green Bus Lines v. Ocean Accident & Guar. Corp.,* 287 N.Y. 309, 39 N.E.2d 251, 162 A.L.R. 241 (1942). *See also Butler v. Sequeira,* 100 Cal.App.2d 143, 223 P.2d 48 (1950); *Brown v. Union Bus Co.,* 61 Ga.App. 496, 6 S.E.2d 388 (1939); *Bynum v. Wiggins,* 107 So.2d 476 (La.App.1958).

This result may well be dictated by the rule stated in *National Mut. Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 742, 356 S.E.2d 488, 496 (1987):

> "An exclusion in a ... liability policy should not be so construed as to 'strip the insured of protection against risks incurred in the normal operation of his business,' especially when the insurer was aware of the nature of the insured's normal operations when the policy was sold. *Chemtec Midwest Services, Inc. v. Insurance Company of North America,* 279 F.Supp. 539 (W.D.Wis.1968); *see Boswell [v. Travelers Indem. Co.],* 38 N.J.Super. 599, 610, 120 A.2d 250, 255 [ (1956) ]."

There is no question here that Buckeye knew it was insuring a bus transit company. As a sophisticated insurer, it must have been aware of its insured's heightened degree of care toward its passengers.

■ In closing, we point out that our ruling rests upon a rather narrow basis. First, the intentional tort insurance policy exclusion is ineffective only up to the amount of the mandatory coverage required by our Safety Responsibility Law. W.Va.Code, 17D–4–12(b)(2). The policy may exclude liability for damages in excess of this mandatory coverage which result from an intentional tort. Second, because the defendant was a common carrier and the plaintiff was a passenger assaulted by the driver on the bus, this assault is deemed to have arisen out of the use of that vehicle. To the extent that the trial court imposed a broader liability on Buckeye, the judgment is reversed.

For the foregoing reasons, the summary judgment ruling of the Circuit Court of Marion County in the declaratory judgment action, finding coverage to the full extent of the insurance policy limits, is reversed, and the case is remanded.

Reversed and remanded.

**14.** *See generally* 14 Am.Jur.2d *Carriers* § 916 (1964).