412 S.E.2d 814

**Phyllis BABER, Administratrix of the Estate of Richard Marshall Walker, and Raymond Walker, Plaintiffs Below, Appellees,**

**v.**

**Nicholas FORTNER, by Thomas POE, Guardian ad Litem, Defendant Below, Appellant,**

**v.**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Intervenor Below, Appellee.**

No. 20138.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 1991.

Decided Dec. 19, 1991.

414

G. David Brumfield, Welch, for appellant.

James R. Watson, Steptoe & Johnson, Charleston, for appellee.

BROTHERTON, Justice:

In this case, we are asked to determine whether the appellant's voluntary manslaughter conviction established the element of intent for purposes of determining coverage under an intentional injury exclusion clause in a liability insurance policy, and thus precluded the appellant's relitigation of the issue in subsequent civil proceedings which were instituted against him.

The appellant, Nicholas Fortner, and his wife, Diane, separated in 1983. On Novem-

ber 15, 1983, Fortner went to visit his estranged wife and found her outside with her boyfriend, Richard Walker, in the yard of the home where she was staying. Despite their separation, the Fortners continued to see each other and were considering reconciliation. According to Fortner, this angered Walker, who had threatened him on previous occasions and even engaged him in a car chase. Mrs. Fortner told her husband that Walker carried a gun, and Fortner states that because he feared for his life, he started carrying a pistol in his pickup truck.

On the evening in question, Fortner maintains that he was inside his truck, backing out of the driveway, and attempting to turn around and return home, when Walker began cursing and threatening him. When Mrs. Fortner tried to restrain Walker, he pushed her to the ground. He then charged Fortner. Believing that he saw a weapon in Walker's hand, Fortner picked his own pistol off the seat of the truck and fired it through the open driver's side window at Walker. Walker died as a result of the gunshot wound.

On May 7, 1984, Nicholas Fortner was indicted for the first-degree murder of Richard Walker. He entered a plea of not guilty by reason of self-defense on September 11, 1984. On April 12, 1985, a Wyoming County jury found Fortner guilty of voluntary manslaughter with the use of a firearm.

On November 12, 1985, Phyllis Baber, the Administratrix of the Estate of Richard Walker, and Raymond Walker instituted a wrongful death action against Fortner, alleging that he was guilty of intentional misconduct and negligence in Richard Walker's death. Fortner had an automobile liability insurance policy with State Farm Mutual Automobile Insurance Company. Consistent with the coverage provided by this policy, he maintained that his shooting of Walker arose out of his "operation, maintenance and use" of the insured motor vehicle. Fortner notified State Farm of the wrongful death suit which Walker's estate had filed against him and requested

that State Farm defend him in the tort action and pay any resulting judgment.

Upon learning of Fortner's demand for coverage, State Farm moved to intervene in the wrongful death action, and subsequently moved for summary judgment against Fortner based on an Intentional Acts Exclusion contained in the insurance policy. State Farm argued that because Fortner was found guilty of voluntary manslaughter, the issue of whether his actions in causing the decedent's death were negligent and therefore possibly covered by its liability policy, or were intentional and therefore excluded, were governed by the doctrine of collateral estoppel.

In an opinion letter dated March 19, 1990, the lower court ruled that "the automobile liability insurance policy of Nicholas Fortner does not provide coverage in this case and ... the insurance company is under no obligation to defend or to indemnify its insured, Nicholas Fortner, for the injuries and death of Richard M. Walker." The judge also added:

I do not believe the death of Richard Walker arose out of the operation, maintenance or use of the vehicle, but that the vehicle was merely the situs for the shooting and not a causal link in the killing of Richard Walker. In all probability, the killing of Richard Walker would have occurred if Fortner had been on foot, or on a bicycle, moped, or small car.

On May 1, 1990, the Circuit Court of Wyoming County entered an order granting summary judgment in favor of the intervenor, State Farm, stating that the "policy of insurance provides no coverage for the acts of Nicholas Fortner upon which the complaint is founded."

The appellant, Nicholas Fortner, now appeals from this summary judgment order, and argues that his voluntary manslaughter conviction was not determinative of the issue of intent. The appellant contends that his shooting of Walker was not a malicious act, but one which was necessary to protect himself. The appellant argues that the trial court erred when granting summary judgment for State Farm by rely-

ing solely upon his voluntary manslaughter conviction and applying the doctrine of collateral estoppel, thereby finding that the issue of intent had previously been adjudicated in the criminal case.

Our review of the record in this case does not indicate that this was, in fact, the basis for the lower court's decision. As we noted above, the court found that Walker's death did not arise out of the "ownership, maintenance or use" of the truck, but that the truck was merely the situs for a shooting which in all probability would have occurred regardless of Fortner's mode of transportation, or lack thereof. We agree with the lower court's conclusion, and will briefly discuss not only this issue, but address as well the application of the doctrine of collateral estoppel against the appellant, as the two issues appear to be inextricably linked in our analysis.

■ The issues raised by the facts of this case have been litigated in a wide variety of contexts, and as a result, the phrase "arising out of the ownership, maintenance or use" in automobile insurance policies has been given a broad interpretation.[1] For example, in cases involving the accidental discharge of a gun during the loading and unloading of a vehicle, courts have held that liability coverage exists because the applicable policies define "use" to include loading and unloading vehicles. *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.,* 491 S.W.2d 363 (Tenn.1973); *Laviana v. Shelby Mut. Ins. Co.,* 224 F.Supp. 563 (D.Vt.1963); *Allstate Ins. Co. v. Valdez,* 190 F.Supp. 893 (E.D.Mich.1961); *Viani v. Aetna Ins. Co.,* 95 Idaho 22, 501 P.2d 706 (1972); *Allstate Ins. Co. v. Truck Ins. Exchange,* 63 Wis.2d 148, 216 N.W.2d 205 (1974).

Auto insurers have also been held liable for coverage when a bump in the road or a similar impact results in the discharge of a firearm which is being transported. Courts have reasoned in such cases that a causal connection existed between the accidental discharge of the firearm and the

movement or operation of the vehicle. *See State Farm Mut. Auto. Ins. Co. v. Partridge,* 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973); *Southeastern Fidelity Ins. Co. v. Stevens,* 142 Ga.App. 562, 236 S.E.2d 550 (1977).

Courts usually impose liability on automobile insurers in cases involving the accidental discharge of firearms during hunting trips or while firearms are either resting in or being removed from gun racks in an insured vehicle. For example, in holding that an insurer was liable for the injuries and death which resulted when a rifle discharged as it was being removed from a jeep after a hunting trip, the Colorado Supreme Court held that "[a]n accident occurs 'on account of the use of a motor vehicle' if the injury that forms the basis of the claim is causally related to a conceivable use of the insured vehicle that is not foreign to its inherent purpose." *Kohl v. Union Ins. Co.,* 731 P.2d 134, 135 (Colo.1986), citing *Azar v. Employers Cas. Co.,* 178 Colo. 58, 495 P.2d 554 (1972); *Mason v. Celina Mut. Ins. Co.,* 161 Colo. 442, 423 P.2d 24 (1967). "The transportation of hunters and their weapons to areas where they can pursue their sport is undeniably a conceivable use of a four-wheel-drive vehicle." *Kohl,* 731 P.2d at 136.

In spite of these cases and others finding that the discharge of a firearm inside a motor vehicle arises within the "ownership, maintenance or use" of the vehicle, a line must be drawn at some point. Courts have generally refused to interpret the phrase so as to provide liability insurance coverage for acts which involve intentional shootings. In *Nationwide Mut. Ins. Co. v. Brown,* 779 F.2d 984, 988 (4th Cir.1985), the Fourth Circuit summarized various decisions on the issue by stating:

Courts confronted with the general question of whether personal injuries resulting from physical assaults by insured vehicle passengers or operators "arose out of" the ownership, maintenance or use of the vehicle, have almost unani-

---

**1.** For a discussion of five principal categories of such cases, *see Cameron Mut. Ins. Co. v. Ward,* 599 S.W.2d 13, 15–16 (Mo.App.1980).

mously found no causal relation between the "use" of the vehicle and such assault-caused injuries.

\* \* \* \* \* \*

In cases dealing with the specific situation here in issue—a shooting by a passenger in or operator of an insured vehicle—the decisions have uniformly applied and found unmet a comparable causal relation requirement.[2]

In this case, the appellant urges this Court to find that his shooting of Walker occurred within the "operation, maintenance and use" of his truck, arguing that there was an actual nexus between his use of the insured vehicle and the shooting. He maintains that "but for" the fact that he was driving the truck and experienced difficulty getting the vehicle turned around when he feared Walker's assault, "the tragedy might have been avoided."

In *Detroit Automobile Inter–Insurance Exchange v. Higginbotham*, 95 Mich.App. 213, 290 N.W.2d 414, 419 (1980), cited by the Fourth Circuit in *Brown, supra,* as a representative case, the Michigan court stated:

> Cases construing the phrase "arising out of the ... use of a motor vehicle" uniformly require that the injured person establish a causal connection between the use of the motor vehicle and the injury. (Citation omitted.) *Such causal connection must be more than incidental, fortuitous or but for. The injury must be foreseeably identifiable with the normal use of the vehicle.* (Citations omitted.) (Emphasis added.)

The phrase "arising out of the ownership, maintenance or use" was briefly discussed by this Court in *Dotts v. Taressa J.A.,* 182 W.Va. 586, 592, 390 S.E.2d 568, 574 (1990), wherein we noted that "the phrase is not a restrictive one." Rather than attempt a comprehensive definition of each term, however, we simply stated that "[i]t is sufficient if the event on which coverage is premised can fall within any one of these terms." *Id.*[3]

---

**2.** *But see State Farm. Mut. Auto. Ins. Co. v. Davis,* 937 F.2d 1415 (9th Cir.1991), in which the Ninth Circuit Court of Appeals affirmed a lower court decision finding that a shooting incident by the insured of a vehicle while driving it resulted from the use of the vehicle, thereby triggering the insurer's liability. The insured, Davis, was a passenger in his own van, along with two fellow Marines, one of whom was driving. They were travelling on an interstate when they were passed by a Corvette. Davis instructed the driver to overtake the Corvette, and as the van approached the rear of the Corvette, Davis fired a .44 caliber revolver out his window which struck and shattered the rear window of the Corvette and struck the driver in the back of the head. His wife was able to bring the car to a stop.

The Ninth Circuit found that, in this case, the use of the van "had more than a minimal causal connection with the incident leading to [the driver's] injuries." *Davis,* 937 F.2d at 1422. The Court noted that the van was used to chase the Corvette down the highway, and was driven into a position next to the Corvette that gave Davis the opportunity to fire his gun, which he did from inside the vehicle. *Id.* at 1421.

While there was significantly more evidence of a causal connection between the vehicle and the shooting in *Davis* than in the case now before us, we must point out as well that there are significant issues which were not addressed by the Ninth Circuit. In footnote 1 of that opinion, the Court explained:

> In the parties' view, further factual development is necessary before the trial court can determine whether Davis's act was intentional, whether [the victim's] injuries resulted from an accident and whether [the driver's] conduct figures in resolving these questions. Both parties asked us not to rule on the question of whether this incident involved an accident and the related question of whether California Insurance Code § 533 (1972), which prohibits insurance coverage for losses caused by the willful act of the insured, applies in this case. While we have the power to affirm on the basis that the incident was not an accident, *cf. Badea v. Cox,* No. 89–55638, slip op. 5198, 5203 n. 2, 931 F.2d 573, 577 n. 2 (9th Cir. April 25, 1991), we accept the parties' request and decline to do so. Therefore, *we do not address the question whether Davis's acts were intentional or willful* and if so, whether [the victim's] injuries might nevertheless have resulted from an accident.

*Davis,* 937 F.2d at 1417, n. 1 (emphasis added).

**3.** In *Dotts,* we concluded that a sexual assault upon a passenger by a driver of a transit authority bus arose out of the use of that vehicle "because the defendant was a common carrier and the plaintiff was a passenger assaulted by the driver on the bus." 182 W.Va. at 592, 390 S.E.2d at 575. "We are dealing with a common carrier which, under our law and general law elsewhere, owes to its passengers the duty to use

In this instance, we do not find that the event on which coverage is premised falls within any one of these terms. Fortner's shooting of Walker was not "foreseeably identifiable with the normal use of the vehicle." The shooting did not occur because Fortner drove the truck to visit his wife. The vehicle functioned merely as the situs of a shooting which could easily have occurred elsewhere, given the circumstances. For this reason, we conclude that an intentional shooting which occurs from within the cab of a stationary pickup truck is not an act arising out of the ownership, maintenance, or use of the vehicle.

■ We now turn to a discussion of the application of the doctrine of collateral estoppel against the insured appellant. The fact that the appellant was convicted of voluntary manslaughter meant that a jury determined that he acted with the intention of injuring or killing Richard Walker.[4] The appellant even admits that the shooting was intentional, but maintains that it was an act of self-defense. However, self-defense is not necessarily an exception to an intentional acts exclusion. In *State Farm Fire and Cas. Co. v. Marshall*, 554 So.2d 504 (Fla.1989) the insured conceded that intentional acts were excluded from coverage under his policy and that he intended to harm his assailant, but he argued that public policy supported coverage because he was acting in self-defense. The Supreme Court of Florida disagreed:

> We align ourselves with the majority of jurisdictions, which hold that self-defense is not an exception to the intentional acts exclusion and the clear terms of the policy control. In such cases, the sanctity of the parties to freely contract

prevails. Members of the public may wish to insure themselves against liability incurred while lawfully defending themselves, but they must bargain for such coverage and pay for it.

*Id.* at 505–506.[5]

In the case now before us, State Farm maintains that the appellant's voluntary manslaughter conviction constituted a judicial rejection of his self-defense plea which precludes the assertion that his act was anything other than intentional. Therefore, State Farm argues that the appellant is collaterally estopped from claiming coverage under his automobile liability insurance policy and receiving indemnification for any judgment the victim's estate might secure against him. We agree.

However, we note that under certain circumstances, several courts have held that an insured's criminal conviction on a jury verdict does not conclusively establish the insured's intent for purposes of determining coverage under a liability policy containing an intentional acts exclusion.[6] For example, in his argument the appellant relies strongly upon and urges this Court to follow the Supreme Court of California's decision in *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978), in which the widow and son of the murdered Dr. Clemmer sued to recover a wrongful death judgment from the killer's liability insurer. The defendant, Dr. Lovelace, did not testify at his criminal trial, and at the conclusion of the guilt phase of the proceedings he withdrew his plea of not guilty by reason of insanity. He was convicted of second degree murder. The Clemmers subsequently received a default judgment in the amount of $2,003,421

the highest degree of care to transport them safely." *Id.*

**4.** In syllabus point 1 of *State v. Duvall*, 152 W.Va. 162, 160 S.E.2d 155 (1968) this Court stated:

> The offense of voluntary manslaughter involves an intent to kill; and an instruction or charge to a jury defining such offense, which omits any reference to intent as an element of the offense, is presumed to have been prejudicial to a defendant being tried on an indictment under which he might be convicted of that offense, and constituted reversible error.

See also *State v. Hamrick*, 160 W.Va. 673, 236 S.E.2d 247 (1977).

**5.** See Annot., *Acts In Self–Defense As Within Provision of Liability Insurance Policy Expressly Excluding Coverage For Damage Or Injury Intended Or Expected By Insured*, 34 A.L.R.4th 761 (1984).

**6.** See Annot., *Criminal Conviction As Rendering Conduct For Which Insured Convicted Within Provision of Liability Insurance Policy Expressly Excluding Coverage For Damage Or Injury Intended Or Expected By Insured*, 35 A.L.R.4th 1063 (1985).

against Dr. Lovelace for the wrongful death.

The Clemmers sought to satisfy the judgment by suing Hartford Insurance Company, with whom Dr. Lovelace had a personal comprehensive liability policy with a limit of $5,000,000. Among other defenses, Hartford asserted that the killing was a willful act excluded from coverage by a state law which provided that "[a]n insurer is not liable for a loss caused by the willful act of the insured; . . ." California Insurance Code, § 533 (1972).

The trial court rejected the insurance company's contention that Dr. Lovelace's second degree murder conviction collaterally estopped the Clemmers from arguing that the killing was not willful. The parties agreed to try the issue of Dr. Lovelace's willfulness in the killing before a jury. Thereafter, the jury returned a special verdict concluding that Dr. Lovelace lacked the mental capacity to intend to shoot and harm the victim and lacked the capacity to govern his own conduct. *Clemmer*, 151 Cal.Rptr. at 288, 587 P.2d at 1101.

Upon appeal, the Supreme Court of California found that:

> . . . the requisite privity between plaintiffs and Dr. Lovelace which would justify application of the doctrine of collateral estoppel is lacking where, although plaintiffs' rights against Hartford are based on Lovelace's insurance policy, plaintiffs' interests in litigating the issue of willfulness differed from those of Dr. Lovelace and were therefore not adequately represented by him in his prior criminal trial.

*Clemmer*, 151 Cal.Rptr. at 289, 587 P.2d at 1102. This conclusion was based in part on the fact that, after he was found guilty of second degree murder, Dr. Lovelace withdrew his plea of not guilty by reason of insanity:

> He may well have done so as a result of a determination of his part that the sentence to be served by him under a second degree murder conviction would be preferable to the possible consequence of his prevailing on his insanity pleas, to wit, commitment to a state mental hospital (see Pen.Code, § 1026). For this reason,

it cannot be said that Lovelace had the same interests in fully litigating the issue of the willfulness of his act in killing Dr. Clemmer as do the plaintiffs herein. We therefore hold that whereas plaintiffs are subject to any defenses that Hartford would have had against Lovelace, such defenses must be proved by Hartford.

Thus, the Supreme Court of California held that the Clemmers could not be precluded from litigating the issue of willfulness by application of the doctrine of collateral estoppel. *Clemmer*, 151 Cal.Rptr. 285, 290, 587 P.2d 1098, 1103.

State Farm counters the appellant's reliance on *Clemmer* by citing the Supreme Court of Oregon's decision in *State Farm Fire and Cas. Co. v. Reuter*, 299 Or. 155, 700 P.2d 236 (1985), in which a sexual assault victim brought a civil suit against her assailant, Reuter, after he was convicted of a criminal assault against her.

In *Reuter*, as in the case now before us, State Farm contended in the lower court that the insured's criminal conviction precluded any coverage for the alleged liability of its insured. Specifically, State Farm argued that the sexual assault victim was collaterally estopped from claiming coverage under State Farm's homeowner's liability policy because of Reuter's earlier sexual assault conviction. At the criminal trial, Reuter pleaded not responsible by reason of mental disease or defect, but was subsequently convicted of first degree rape. Reuter's liability insurance policy with State Farm contained an exclusion which stated that the policy did not apply "to bodily injury or property damage which is either expected or intended from the standpoint of the insured. . . ."

The victim instituted a damage action against Reuter, alleging that Reuter's conduct occurred while he was "suffering from a mental disorder which, among other things, caused [Reuter] to be unable to conform his conduct to the requirements of law." State Farm filed a motion for summary judgment, asserting that Reuter had been found guilty of first degree rape "after a full trial on all issues" and that "the

defense of diminished mental capacity was actually raised and fully adjudicated." State Farm argued that Reuter's homeowner's policy did not provide liability or any other type of insurance coverage for anyone as a result of the rape. *Reuter,* 700 P.2d at 238. State Farm's motion for summary judgment was granted by the trial court. However, the victim appealed, and the Court of Appeals reversed. *State Farm Fire and Cas. Co. v. Reuter,* 68 Or.App. 17, 680 P.2d 1000 (1984).

On appeal, the Supreme Court of Oregon stated:

> If a person has had a full and fair opportunity to litigate a claim to final judgment, most courts (including this one) hold that the decision on a particular issue or determinative fact is determinative in a subsequent action between the parties on the same claim (direct estoppel). *See, e.g., Waxwing Cedar Products v. Koennecke,* 278 Or. 603, 610, 564 P.2d 1061, 1064–65 (1977); *Bahler v. Fletcher,* 257 Or. 1, 4, 474 P.2d 329, 331 (1970). The judgment generally is conclusive as well in a different action between the parties as to issues actually litigated and determined in the prior action if their determination was essential to the judgment (collateral estoppel). *See, e.g., Bahler v. Fletcher, supra,* 257 Or. at 4, 474 P.2d at 331.

*Reuter,* 700 P.2d at 238. Although the Court of Appeals held that the "plaintiff failed to produce any evidence regarding Reuter's mental state," the Supreme Court of Oregon disagreed:

> The record supports every assertion of fact made by State Farm in its motion for summary judgment. There is no question but that the jury in the criminal case rejected Reuter's claim that he was suffering from a mental disorder that caused him to be unable to conform his behavior to the requirement of law. The jury found, beyond a reasonable doubt, that Reuter "did unlawfully and knowingly, by forcible compulsion, engage in sexual intercourse with [the victim]."

*Reuter,* 700 P.2d at 238–39. The *Reuter* Court distinguished *Clemmer* by noting

that in order "[f]or the result of the previous case to be binding against the successor in interest, the issue must have been actually litigated." *Reuter,* 700 P.2d at 243, n. 10. In *Clemmer,* the defendant withdrew his plea of not guilty by reason of insanity, and upon review the Supreme Court of California concluded that the defendant's interest in having the issue of his willfulness litigated at the criminal proceeding differed from the plaintiffs'. In *Reuter,* the court stated that "there is no suggestion that Reuter failed to assert as vigorous and effective a defense as possible." *Reuter,* 700 P.2d at 243, n. 10.

Both *Clemmer* and *Reuter* are distinguished from the case now before us in that in both cases it was the victim who sought to relitigate the issue of the insured's intent in a subsequent civil proceeding so that they might benefit from the insured's liability policy. In our case, however, it is the insured (the appellant) who resists the victim's attempt to invoke the doctrine of collateral estoppel and thereby prevent the insured from relitigating what has already been deemed an intentional killing.

Such a distinction is of little significance, however, because just as was the case in *Reuter,* no suggestion is made here that the appellant did not avail himself of all possible defenses at his criminal trial. Under the higher standard of proof utilized in criminal proceedings, a jury found Nicholas Fortner guilty of voluntary manslaughter and, by implication, thereby found that he acted with an intent to kill. A relitigation of the issue under a lesser civil standard would be pointless.

In syllabus point 2 of *Conley v. Spillers,* 171 W.Va. 584, 301 S.E.2d 216 (1983), we stated that the doctrine of collateral estoppel "is designed to foreclose relitigation of issues in a second suit which have actually been litigated in the earlier suit even though there may be a difference in the cause of action between the parties of the first and second suit." We also noted that "[a] fundamental due process point relating to the utilization of collateral estoppel is that any person against whom

collateral estoppel is asserted must have had a prior opportunity to have litigated his claim." *Id.* at syl. pt. 8.

 There is no question but that the issue of the appellant's intent was submitted to a jury which found him guilty, beyond a reasonable doubt, of voluntary manslaughter. His suggestion that the jury verdict was a compromise, and thus not determinative of the issue, is without merit. Because the appellant had the opportunity to fully litigate the issue in the criminal proceeding below, he cannot now claim that the application of the doctrine of collateral estoppel, thereby foreclosing a relitigation of the issue of his intent, impairs his due process rights. We conclude, therefore, that the adjudication of a killing which results in a voluntary manslaughter conviction conclusively establishes the intentional nature of that same act for the purposes of any subsequent civil proceeding.

For the foregoing reasons, the May 1, 1990, summary judgment order of the Circuit Court of Wyoming County is hereby affirmed.

Affirmed.