

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-27-2001

# Hughes v. Long

Precedential or Non-Precedential:

Docket 99-2037

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Hughes v. Long" (2001). *2001 Decisions.* Paper 37.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/37

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 27, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-2037

PETER J. HUGHES, Jr.,

     Appellant

v.

LYNN E. LONG; KATHLEEN LACEY;
PATRICK J. MCHUGH

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. No. 97-cv-03304)
District Judge: The Honorable Harvey Bartle, III

ARGUED December 14, 2000

BEFORE: NYGAARD, and STAPLETON, Cir cuit Judges,
and DEBEVOISE,* District Judge.

(Filed: February 27, 2001)

       Lek Domni, Esq. (Argued)
       Suite 1001
       1429 Walnut Street
       Philadelphia, PA 19102
        Attorney for Appellant

_____

* Honorable Dickinson Debevoise, District Judge for the United States
District Court for the District of New Jersey, sitting by designation.

          L. Rostaing Tharaud, Esq.
            (Argued for Lynn E. Long)
          Jonathan F. Ball, Esq.
            (Argued for Patrick J. McHugh)
          Marshall, Dennehey, Warner,
            Coleman & Goggin
          1845 Walnut Street
          21st Floor
          Philadelphia, PA 19103
            Attorneys for Appellees

OPINION OF THE COURT

NYGAARD, Circuit Judge.

This is the second time we have been asked to r esolve issues stemming from divorce and custody proceedings involving Peter and Pamela Hughes. In this appeal, Peter J. Hughes challenges the District Court's grant of summary judgment, dismissing his civil rights claims under 42 U.S.C. SS 1983 & 1985 and his state law claims against defendants Lynn Long and Patrick McHugh. Hughes argues that the District Court erroneously granted defendants absolute prosecutorial and witness immunity for his civil rights claims and that the Supreme Court of Pennsylvania's recent decision in LLMD of Michigan, Inc. v. Jackson-Cross Co., 559 Pa. 297, 740 A.2d 186 (Pa. 1999), pr ecludes immunity for his state law claims. We affir m the District Court's dismissal of Hughes's civil rights claims, although for reasons different from those set forth by the District Court;1 we also affirm the District Court's dismissal of Hughes's state law claims because we predict that, if faced

_____

1. We may affirm a District Court's judgment on grounds other than those considered by the District Court itself. See, e.g., Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1145 n. 1 (3d Cir. 1983) ("An appellate court may affirm a result r eached by the District Court on different reasons, as long as the record supports the judgment."); PAAC v. Rizzo, 502 F.2d 306, 308 n. 1 (3d Cir . 1974) ("It is proper for an appellate court to affirm a correct decision of a lower court even when that decision is based on an inappropriate gr ound.").

with the issue, the Pennsylvania Supreme Court would not extend its holding in LLMD to court-appointed witnesses.

I.

Hughes's claims against Long and McHugh stem fr om an acrimonious child custody proceeding that took place in the Court of Common Pleas of Chester County between Hughes and his former wife, Pamela Hughes. The custody dispute began when, in the midst of her divorce fr om Hughes, Pamela filed a Petition for Temporary Custody of the children. In response to this Petition, the court scheduled a Conciliation Conference before a Custody Conciliator. The Custody Conciliator recommended that appellee Long, a licensed clinical social worker, conduct a full custody evaluation. The court adopted this recommendation, ordering Hughes and Pamela to participate in psychological evaluations with Long. According to the or der, Long was to report the results of the psychological evaluations to the court and make any recommendations appr opriate to a child custody determination. Although the court appointed Long to conduct the evaluation, Long entered into a private contract with the parties whereby each agr eed to pay fifty percent of her fee.

In accordance with the court's order , Long conducted the evaluation. She interviewed Hughes, Pamela, the children, and others. She also referred Hughes and Pamela to Kathleen Lacey, a psychologist who worked with Long in her custody evaluations, for psychological testing. Because Lacey was not licensed at the time of the evaluations, she practiced under the supervision of appellee McHugh, a licensed clinical psychologist. McHugh did not dir ectly supervise the tests administered by Lacey, but he did review the results and approved her r ecommendations.

It is not clear what occurred at the conclusion of the psychological testing. Apparently, after completing the psychological tests, Long informally told Hughes her custody recommendation for the children. For reasons unexplained, Hughes was dissatisfied with this recommendation and therefore he hir ed his own expert, Dr. Gerald Cooke, to evaluate the results of the tests that Long

and Lacey administered. According to Hughes, Long and Lacey refused to give Dr. Cooke the information upon which they based their conclusions, despite repeated requests and a court order. Hughes claims that, rather than complying, Long fabricated new data to support her report and that Lacey and McHugh produced new psychological tests and results that were more favorable toward Pamela. He contends that Long, Lacey, and McHugh gave these false reports to Dr. Cooke and destroyed the original data.

During the custody hearing, Hughes presented his allegations of fraudulent behavior by Long, Lacey, and McHugh. All three testified during the hearing and denied creating false reports, destroying any originals, or intentionally failing to comply with the court's or der to release their raw data. Long testified in person and the depositions of Lacey and McHugh were read. Despite Hughes's allegations of fraud, the court adopted Long's formal recommendation and awarded joint custody to Hughes and Pamela.

Hughes appealed the order of joint custody to the Superior Court of Pennsylvania but later withdr ew the appeal. After abandoning his state court appeal, hefiled suit against the appellees2 in the United States District Court for the Eastern District of Pennsylvania, alleging interference with his familial rights in violation of the Fourteenth Amendment and his civil rights under 42 U.S.C. SS 1983 and 1985(3). Hughes also alleged the following state law violations: (1) abuse of legal process; (2) defamation, false light, and invasion of privacy; (3) civil conspiracy; (4) fraud; (5) tortious interfer ence with familial

_____

2. Along with Long and McHugh, Hughes also filed suit against Lacey and Judge MacElree, who presided over the underlying custody proceeding in the Chester County Court of Common Pleas. Lacey, however, refused to file a response to his complaint and, therefore, the District Court entered a default judgment against her. Judge MacElree filed a Motion to Dismiss arguing that he was entitled to absolute judicial immunity. The District Court granted his motion to dismiss and, on appeal, we affirmed. See Hughes v. MacElree, 1997 WL 733609, at *1 (E.D. Pa. Nov. 13, 1997), rev'd on other grounds, 168 F.3d 478 (3d Cir. 1998). As such, neither Lacey nor Judge MacElr ee are parties to this appeal.

4

relations; (6) breach of contract; and (7) breach of implied contract. In response to Hughes's complaint, appellees filed their respective motions to dismiss. The District Court granted those motions on the basis of the Rooker –Feldman doctrine, which holds that a federal court does not have subject-matter jurisdiction to review the final adjudications of a state's highest court or to evaluate constitutional claims that are inextricably intertwined with the state court's custody proceeding. In dismissing Hughes's claims, the court relied solely on this doctrine and did not rule on appellees' arguments that they are entitled to absolute prosecutorial immunity pursuant to our decision in Ernst v. Child & Youth Servs., 108 F.3d 486 (3d Cir. 1997).

On appeal, we reversed the District Court with respect to its holding that the Rooker–Feldman doctrine warranted a dismissal of Hughes's claims. See Hughes v. MacElree, 168 F.3d 478 (3d Cir. 1998). We also refused to affirm the dismissal of Hughes's complaint on the alter native basis that Long and McHugh are entitled to absolute prosecutorial immunity under Ernst . We found that an evidentiary record of appellees' pr ecise functions with respect to their participation in the underlying custody case had not been developed.

On remand, Long and McHugh filed a motion for summary judgment, reasserting their argument that they are entitled to prosecutorial immunity under Ernst. The District Court granted Long's and McHugh's motions, agreeing that they are entitled to absolute prosecutorial immunity from Hughes's SS 1983 and 1985 claims. Alternatively, the court held that Long and McHugh were entitled to witness immunity. The court also held that under Pennsylvania law, Long and McHugh were entitled to immunity from Hughes's supplemental state law claims. On December 9, 1999, Hughes filed a timely Notice of Appeal.

II.

Hughes first argues that the District Court erred by holding that Long and McHugh are entitled to absolute prosecutorial immunity pursuant to our holding in Ernst. He argues that appellees did not function as"advocates" for

the "state" like prosecutors and child welfare workers. Further, he argues that, in contrast to prosecutors and child welfare workers who initiate criminal and dependency proceedings, appellees did not initiate the custody proceedings. We have jurisdiction pursuant to 28 U.S.C. S 1291 and exercise plenary review over a District Court's grant of summary judgment. See Mardell v. Harleysville Life Ins. Co., 31 F.3d 1221, 1224 (3d Cir . 1994).

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured." 42 U.S.C. S 1983. On its face, it contains no defense of official immunity. In Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 788 (1951), however, the Supreme Court held that Congress did not intend S 1983 to abrogate immunities "well grounded in history and reason." In determining whether an immunity meets this standard, a court must first deter mine whether "an official was accorded immunity fr om tort actions at common law when the Civil Rights Act was enacted in 1871." Malley v. Briggs, 475 U.S. 335, 340, 106 S.Ct. 1092, 1095 (1986). If a common-law counterpart is found, a court must next determine whether S 1983's history or purposes nonetheless discourage recognition of the same immunity in S 1983 actions. See id.

Even if an official did not enjoy absolute immunity at common law, she may still be entitled to immunity if she performs "special functions" that are similar or analogous to functions that would have been immune when Congr ess enacted S 1983. See Butz v. Economou, 438 U.S. 478, 406, 98 S.Ct. 2894, 2911 (1978). This "functional appr oach" looks to the nature of the function per formed, not the identity of the actor who performed it and evaluates the effect that exposure to particular for ms of liability would likely have on the appropriate exercise of that function. See Forrester v. White, 484 U.S. 219, 224, 108 S.Ct. 538, 542 (1988). The official seeking immunity bears the burden of showing that it is justified by the function in question. See id.

6

Under its historical and functional approach, the Supreme Court has recognized the defense of absolute immunity from civil rights suits in several well-established contexts involving the judicial process. This immunity has given functionaries in the judicial system the ability to perform their tasks and apply their discretion without the threat of retaliatory S 1983 litigation. Thus, a judge acting in his judicial capacity is absolutely immune fr om suits, unless he acts without any colorable claim of jurisdiction. See Stump v. Sparkman, 435 U.S. 349, 356-57, 98 S.Ct. 1099, 1104-05 (1978); Pierson v. Ray, 386 U.S. 547, 553-55, 87 S.Ct. 1213, 1217-18 (1967). Witnesses, including public officials and private citizens, are immune from civil damages based upon their testimony. See Briscoe v. LaHue, 460 U.S. 325, 341, 345-46, 103 S.Ct. 1108, 1118, 1120-21 (1983). The Court has also granted absolute immunity to prosecutors for activities that are "intimately associated with the judicial process" such as initiating and pursuing a criminal prosecution and presenting the state's case in court. Imbler v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 994-95 (1976). A prosecutor's administrative and investigative duties, however, are not immune. See id. at 430-31, 96 S.Ct. at 994-96.

We have provided social workers absolute immunity for actions involving the initiation and prosecution of child custody or dependency proceedings. In Er nst v. Child & Youth Servs. of Chester County, 108 F .3d 486 (3d Cir. 1997), we held that child welfare workers ar e entitled to absolute immunity for their actions on behalf of the state in preparing for, initiating, and pr osecuting dependency proceedings, and that this immunity was br oad enough to include the formulation and presentation of recommendations to the court in the course of the proceedings. In reaching this conclusion, we first reasoned that, similar to prosecutors who are r esponsible for the initiation of criminal proceedings, child welfare workers are responsible for bringing dependency proceedings and must exercise independent judgement in deter mining when to bring such proceedings. We also noted that, like prosecutors, child welfare workers often have to make decisions in a short amount of time and with limited information. See id. at 495-96.

7

Additionally, we explained that child services workers are like prosecutors because they are " `advocates for the State' " and serve in a function " `intimately associated with the judicial phase of the [child protection] process.' " Id. (quoting Imbler, 424 U.S. at 430-31 n.33, 96 S.Ct. at 995, 996 n.33). Specifically, we noted that child welfare workers are directly responsible for recommendations made to the court in dependency proceedings and for their actions in determining those recommendations and communicating them to the court. We concluded that this direct responsibility was similar to a prosecutor's in criminal prosecutions. See id.

Next, we reasoned that public policy considerations support absolute immunity for child welfare workers. See id. We noted that the fear of personal liability would compromise a worker's independent judgement, rendering her overly cautious in dangerous situations where immediate action on behalf of a child is needed. We also noted that the likelihood of suits in retaliation for the initiation of dependency proceedings was great, given a parent's predictable resentment of state interference in the parent-child relationship. Finally, in concluding that child welfare workers deserve absolute immunity, we recognized that alternative mechanisms exist to prevent unconstitutional conduct by child welfare workers. These mechanisms include appellate review of a judge's decision in a dependency hearing and agency supervision of a child welfare worker. See id.

Here, the District Court held that the functions of Long and McHugh in the child custody proceeding were similar to roles of prosecutors and child welfare workers. According to the court, even though Long and McHugh were initially impartial fact-finders, once they arrived at a recommendation they became "de facto advocates for their recommendations." We disagree and hold that Long and McHugh enjoy judicial immunity because they acted as "arms of the court," similar to a guardian ad litem or a court-appointed doctor or psychologist, a non-judicial person who fulfills a quasi-judicial role at the court's request.

8

To explain our analysis, we must examine the precise functions of Long and McHugh in the custody pr oceedings. As indicated above, Long was the court-appointed custody evaluator. In that role, she interviewed Hughes, his former wife, their children, and other relevant parties. She also administered parenting tests to Hughes and his former wife and sent them to Lacey for psychological testing. As directed by the court, Long made a recommendation regarding a custody arrangement for the Hughes children. McHugh's role was slightly differ ent. He was not appointed by the court, but as Lacey's supervisor, he r eviewed and verified the psychological test results and the reports Lacey prepared for Long. Thus, he assisted in the completion of Long's testing, which was an essential and primary component of Long's recommendation. Without his assistance, Long could not have completed the court-ordered psychological evaluations. Like Long, McHugh also reported his findings to the court.

Although Long and McHugh acted like prosecutors and child welfare workers in formulating and presenting recommendations to the court, their roles differed in other significant respects. Most notably, Long and McHugh did not initiate the custody proceeding. Indeed, the court appointed Long after the proceeding began and, thus, Long had no discretion to initiate or "pr osecute" the custody proceeding. Similarly, McHugh only became involved after the proceedings began.

Next, in formulating and making their r ecommendations to the court, Long and McHugh were not "advocates of the State" like prosecutors and child welfar e workers. Rather than making arguments, Long and McHugh mer ely offered their opinions, based upon fact-gathering, in or der to aid and inform the family court. Long's contract states: "[w]henever possible, I make every reasonable attempt to serve as a court appointed impartial examiner , rather than an advocate in custody litigation." J.A. at 1695. Thus, Long and McHugh functioned more like witnesses or assistants to the court than advocates.

Finally, although not a dispositive differ ence, Long and McHugh were not acting under any time constraints and were not forced to make any "snap judgments" based on

incomplete information, as is often the case with prosecutors and child welfare workers. Rather, Long and McHugh took six months to complete their evaluations and did so in a deliberate, methodical, and thor ough fashion. Although the District Court discounts this dif ference, we expressly recognized it as a factor in holding that child welfare workers are analogous to pr osecutors in Ernst. See 108 F.3d at 496.3

Although not cloaked in prosecutorial immunity, Long and McHugh are entitled to judicial immunity because they acted as "arms of the court" and per formed functions integral to the judicial process. Specifically, the court appointed Long to gather information, conduct an evaluation, and make a recommendation to aid the custody determination. McHugh, although not dir ectly appointed, was indirectly assigned this task because his r eview of the court-ordered psychological evaluations was necessary for their completion. In essence, Long's and McHugh's functions were to engage in neutral fact-finding and advise the court. These functions are intimately r elated and essential to the judicial process because they aid and inform the court in its discretionary duties. In the absence of the extensive fact-finding and recommendations of child-custody evaluators, courts would be requir ed to make custody recommendations with little, if any, unbiased information about the family. Given this integral relationship to the court, we hold that Long and McHugh are entitled to judicial immunity.

Long's and McHugh's similarity to a guardian ad litem, an individual who enjoys judicial immunity, supports this conclusion. A guardian ad litem is a person appointed by the court in custody proceedings to serve as an investigator and gather information about the parents and the children and report back to the court recommending which parent

_____

3. Moreover, the public policy considerations enumerated by the District Court are an insufficient basis for granting prosecutorial absolute immunity. Courts "do not have license to establish immunities from S 1983 actions in the interests of what[they] judge to be sound public policy." Buckley v. Fitzsimmons, 509 U.S. 259, 278, 113 S.Ct. 2606, 2618 (1993).

10

should receive custody. See Cok v. Cosentino, 876 F.2d 1, 3 (1st Cir. 1989) ("A GAL typically gathers information, prepares a report and makes a r ecommendation to the court regarding a custody disposition."); Raven C. Lidman, The Guardian Ad Litem in Child Custody Cases: The Contours of Our Judicial System Stretched Beyond Recognition, 6 GEO. MASON L. REV. 256 (1998) (same). Characterized as "agents" of the court, Cok, 876 F.2d at 2-3, and "actual functionar[ies] or ar m[s] of the court," guardian ad litems aid and inform the court. Gardner v. Parson, 874 F.2d 131, 146 (3d Cir . 1989) ("[a] guardian ad litem would be immune in exercising such functions as . . . making reports and recommendations to the court in which the guardian acts as an actual functionary or arm of the court."). Because of this intimate relationship to the court and the judicial process, several courts have held that when performing certain delegated duties, guardian ad litems are entitled to absolute judicial immunity. See Gardner, 874 F.2d at 145; Cok , 876 F.2d at 2-3; see also Myers v. Morris, 810 F.2d 1437 (8th Cir . 1987), rev'd on different grounds, Bur ns v. Reed, 500 U.S. 478, 111 S.Ct. 1934 (1991). Given the striking similarities between the functions of Long and McHugh and the functions of a guardian ad litem, Long and McHugh are entitled to the same judicial immunity.

Moreover, Long and McHugh perfor med functions similar to court-appointed doctors and psychiatrists, who have also received absolute judicial immunity. For example, in McArdle v. Tronetti, 961 F .2d 1083 (3d Cir. 1992), we held that a prison doctor who conducted a psychiatric exam on an inmate at the request of the court had absolute judicial and witness immunity. Specifically, we reasoned that the psychiatrist's conduct in completing the exam and furnishing a written report to the court at the request was entitled to absolute judicial immunity because the psychiatrist was "functioning as an arm of the court." Id. at 1085. We also held that the psychiatrist's r eport and recommendation to the court constituted testimony protected by absolute witness immunity.

Similarly, in Moses v. Parwatikar, 813 F .2d 891 (8th Cir. 1987), the Eighth Circuit granted absolute judicial and

11

witness immunity to a psychiatrist appointed by the court to conduct a competency evaluation. The psychiatrist's appointed duties consisted of examining the plaintiff and reporting his findings to the court. The court held that these duties were "functions essential to the judicial process." Id. at 892. It went on to state that the psychiatrist's function was analogous to a witness in a judicial proceeding. Accordingly, the court granted absolute immunity to ensure that the " `paths which lead to the ascertainment of truth . . . be left as free and unobstructed as possible.' " Id. (quoting Briscoe v. LaHue, 460 U.S. 325, 333, 103 S.Ct. 1108, 1114 (1983)).

Finally, in Meyers v. Contra Costa County Dep't of Social Servs., 812 F.2d 1154 (9th Cir. 1987), the Ninth Circuit granted absolute judicial immunity to counselors employed by a family court. The counselors' duties included mediation of custody and visitation disputes, investigating matters pertaining to such disputes, and providing reports to the court. The Ninth Circuit affirmed the District Court's holding that the counselors were "officers of the court," reasoning that they were "performing a judicial function at the direction of the court." Id. at 1159. Given the nature of their duties, the counselors were granted "quasi-judicial" immunity.

These cases are factually identical to ours and support our conclusion that Long and McHugh are entitled to judicial rather than prosecutorial immunity. Accordingly, we affirm the District Court's grant of summary judgment motion in favor of Long and McHugh dismissing Hughes's SS 1983 & 1985 claims on the basis of judicial immunity.4

III.

Hughes next contends that the Pennsylvania Supreme Court's holding in LLMD of Michigan, Inc. v. Jackson-Cross

_____

4. Because we hold that judicial immunity insulates the entirety of Long's and McHugh's conduct from liability premised on alleged SS 1983 & 1985 violations, we need not address the District Court's alternative holding that Long and McHugh are entitled to summary judgment based on witness immunity.

12

Co., 559 Pa. 297, 740 A.2d 186 (Pa. 1999), which was decided several days after the District Court's ruling, suggests that Long and McHugh are not entitled to witness immunity for his state law claims. He asks us to review their immunity claims in light of LLMD, which holds that witness immunity does not bar professional malpractice actions against private experts who negligently formulate their opinions. See LLMD, 559 Pa. at 306, 740 A.2d at 191. Based on LLMD, he asks us to predict that the Pennsylvania Supreme Court will extend the exception to court-appointed experts and causes of action outside of negligence. Given the unique and essential role of court-appointed witnesses, we believe that, if faced with the issue, the Pennsylvania Supreme Court would confine its holding in LLMD to privately retained experts sued for professional malpractice.

In predicting how a matter would be decided under state law we examine: (1) what the Pennsylvania Supreme Court has said in related areas; (2) the decisional law of the Pennsylvania intermediate courts; (3) federal appeals and district court cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issues we face here. See Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 406 (3d Cir. 2000). As the appellant indicates, LLMD provides the most recent statement from the Pennsylvania Supreme Court on the witness immunity doctrine and its contours.

In LLMD, the Pennsylvania Supreme Court carved out an exception to the state's long standing principle that communications which are "issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought" are immune from civil liability. Post v. Mendel, 510 Pa. 213, 221, 507 A.2d 351, 355 (Pa. 1986). LLMD involved an expert witness hired by a plaintiff to calculate and testify regarding his lost profits resulting from a breach of contract. During cross-examination of the plaintiff's expert, defense counsel established that the expert's lost profits calculation contained an error that completely undermined the basis for the damage amount. Because the expert had not calculated the damages himself, he was unable to correct

13

the error and, as a result, the trial judge struck his testimony. The day after the expert's testimony was stricken, the plaintiff accepted a settlement offer of $750,000. Subsequently, the expert provided a corrected computation of lost profits that indicated $2.7 million in damages. The plaintiff then filed a suit against the expert, asserting causes of action for breach of contract and professional malpractice; the expert claimed immunity under the witness immunity doctrine. See LLMD , 559 Pa. at 187–189, 740 A.2d at 299–301.

Before ruling on the expert's defense, the LLMD court reviewed the public policy considerations underlying the judicial and witness immunity doctrines. The court stated, " `[t]he privilege is also extended to parties to afford freedom of access to the courts, to witnesses to encourage their complete and unintimidated testimony in court, and to counsel to enable him to best represent his client's interests.' " Id. at 189, 740 A.2d at 302 (quoting Binder v. Triangle Publ'n, Inc. 275 A.2d 53 (1971)). Quoting extensive language from Briscoe v. LaHue, the Supreme Court's seminal witness immunity case, the court also explained that " `a witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the fact finder of fact of candid, objective, and undistorted evidence.' " Id. (quoting Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108 (1983)).

The court recognized the continuing significance of these policy concerns but nonetheless concluded that extending witness immunity to actions arising from the negligent formulation of an opinion would not addr ess these concerns. See id. at 191, 740 A.2d at 306. Rather, allowing liability for this sort of negligence would enhance the judicial process "by requiring that an expert render services to the degree of care, skill and pr oficiency commonly exercised by the ordinarily skillful, car eful and prudent members of their profession." Id. The court, however, was careful to point out the limits of its holding. It stressed that experts were still immune from liability premised on the substance of an expert's opinion. Further , the court

14

explained that an expert witness may not be held liable simply because his or her opinion is challenged by another expert or authoritative source. See id. Additionally, the court noted that because the sole issue befor e it was the liability of private experts, its opinion did not address exceptions to the witness immunity doctrine for court-appointed witnesses. See id. at 301 n.4, 740 A.2d at 188 n.4.

Although the LLMD court did not expr essly prohibit the applicability of its exception to witness immunity to court-appointed witnesses, we believe that, if faced with the issue, the Pennsylvania Supreme Court would not disturb the complete immunity that court-appointed witnesses currently enjoy. See, e.g., Clodgo v. Clodgo, 411 Pa. Super. 267, 601 A.2d 342 (Pa. Super. Ct. 1992) (holding that witness immunity doctrine insulates a court-appointed witness from liability premised upon medical malpractice). Our conclusion is largely premised on the differences between privately retained experts, which wer e at issue in LLMD, and court-appointed experts, which ar e at issue in this case. As we emphasized earlier, court-appointed experts hold a unique role in judicial pr oceedings. Because they work on behalf of the court rather than any one party, court-appointed experts provide unbiased, neutral information and recommendations and aid the court in its decision-making process. This neutral infor mation is essential to the court, which cannot make necessary observations and gather relevant facts without assistance. Thus, it is crucial to the judicial process that court-appointed witnesses are free to for mulate and make recommendations unhindered by the fear of liability. Without such immunity, these "advisors" may be reluctant to assist the court, thereby depriving the court of its sole source of neutral information.

While privately retained experts also pr ovide information to the court, they differ in that they enter into a private contract with a party and typically receive compensation for their testimony from that party. Therefor e, to some extent, they are expected to provide a recommendation that favors their client. See FED. R. CIV. P. 26(a)(2)(B) (requiring a party to disclose information concerning its expert witness

15

including the compensation to be paid for the study and testimony and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years); United States v. 412.93 Acres of Land, 455 F.2d 1242, 1247 (3d Cir. 1972) (holding that the District Court properly permitted the introduction of an expert witness's per diem fee in order to show his possible bias); Michelle Morgan Ketchum, Experts: Witnesses for the Persecution? Establishing an Expert Witness's Bias Through the Discovery and Admission of Financial Records, 63 UMKC L. REV. 133, 157–59 (1994) (discussing the legal community's general distrust of expert witnesses and the resulting discovery r equests for discovery of an expert witness's financial recor ds in order to establish interest, bias, or prejudice). Although private experts serve an important role and aid the court in "its path to truth," they are not neutral "advisors" to the court and thus should not be subject to the same treatment as court-appointed experts. In sum, the significant and distinct advisory role of court-appointed experts persuades us that the Pennsylvania Supreme Court will continue to afford them full immunity, despite its exception in LLMD.

Moreover, we believe that LLMD's exception to immunity for the negligent formulation of an opinion is confined to privately retained experts because they owe their clients a duty of reasonable care by virtue of their contractual relationship. As explained by the LLMD court, the purpose of its witness immunity exception is to ensur e that expert witnesses "render services to the degr ee of care, skill and proficiency commonly exercised by the or dinarily skillful, careful and prudent members of their pr ofession." LLMD, 559 Pa. at 307, 740 A.2d at 191. Here, we have neither a private expert nor a cause of action for professional malpractice, both of which compelled the exception in LLMD. Rather we have a court-appointed witness whose role in the judicial proceedings dif fers from a private expert. Further, we have state law claims for abuse of legal process, defamation, false light, invasion of privacy, civil conspiracy, fraud, tortious interference with familial relations, breach of contract, and br each of implied contract, which do not parallel a cause of action for negligence. Therefore, we believe that LLMD's exception to

16

the witness immunity doctrine has limited applicability and does not abrogate Long's and McHugh's immunity from Hughes's state law claims.

IV.

In sum, Long's and McHugh's duties were similar to those of a guardian ad litem or court-appointed psychiatrist or doctor, both of whom are "agents" or "arms" of the court. Therefore, we will affirm the District Court's grant of summary judgment with respect to appellant'sSS 1983 and 1985 claims on the basis of judicial immunity. Mor eover, we affirm the District Court's grant of summary judgment with respect to appellant's state law claims because we believe that, if faced with the issue, the Pennsylvania Supreme Court will not extend LLMD's exception to witness immunity to court-appointed witnesses.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

17