740 A.2d 186

**LLMD OF MICHIGAN, INC., General Partner t/a Wintoll Associates Limited Partnership**

v.

**JACKSON–CROSS COMPANY**

v.

**Robert A. Swift, Esquire and Kohn, Nast & Graf, P.C.**

**Appeal of LLMD of Michigan, Inc., General Partner t/a Wintoll Associates Limited Partnership.**

Supreme Court of Pennsylvania.

Argued Oct. 19, 1998.

Decided Oct. 26, 1999.

Stephen J. Mathes, Jan Fink Call, Michael S. Rosenberg, Philadelphia, for LLMD of Michigan, Inc., et al.

Robert J. Reger, King of Prussia, for Jackson–Cross Co.

C. Andre Washington, for Robert A. Swift, Esq. and Kohn, Nast & Graf, P.C.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

ZAPPALA, Justice.

This is an appeal by LLMD of Michigan, Inc., a general partner trading as Wintoll Associates Limited Partnership (Wintoll), from the Superior Court's order affirming the order of the Philadelphia County Common Pleas Court, which granted summary judgment in favor of Jackson–Cross Company (Appellee) in an action for professional malpractice. For the following reasons, we reverse.

In 1989, Wintoll commenced an action in the United States District Court for the Eastern District of Pennsylvania against Marine Midland Realty Credit Corporation and USLife Life Insurance Company, alleging breach of contract arising out of the defendants' failure to provide financing for the purchase and rehabilitation of an industrial facility in Springfield, Michigan. After the lawsuit was filed, Robert Swift, Esquire, Wintoll's attorney, contacted Charles Seymour, chairman of Jackson–Cross, to engage Seymour's services as Wintoll's expert on the issue of the lost profits suffered as a result of the defendants' breach of their financing commitment for the industrial rehabilitation project. On December 28, 1990, Seymour responded with a proposal outlining the scope of services that he would perform for Wintoll and the fees that would be charged for those services. The proposal contemplated that

Seymour would quantify the damages sustained because of the lenders' failure to close under the mortgage commitments; prepare a signed report outlining what was done, stating the conclusions and supporting them; and participate in pre-trial conferences, depositions and trial. By letter dated January 4, 1991, Wintoll's attorney accepted Seymour's proposal.

Wintoll was subsequently provided with a calculation of the lost profits, which Jackson–Cross estimated to be $6 million. The calculation was prepared by David Anderson, an employee of Jackson–Cross, using a computerized accounting spreadsheet program. The federal trial began on November 24, 1992. Seymour was called by Wintoll to testify as an expert witness on the lost profits calculation on December 7, 1992 and provided his opinion as to the damages sustained by Wintoll.

On cross-examination, defense counsel established that Anderson's lost profits calculation contained a mathematical error that completely undermined the basis for the Jackson–Cross calculation of Wintoll's damages. Seymour conceded that the calculation was wrong because of the error that had been made. Because Seymour had not performed the calculations himself, he was unable to explain the mathematical error in the calculations or to recalculate the lost profits by correcting the error while on the stand. Defense counsel requested that Seymour's opinion be stricken from the record because it was based on inaccurate numbers and on erroneous mathematical calculations. The trial judge granted the motion to strike Seymour's testimony and instructed the jury to completely disregard the testimony during its deliberations.

Without Seymour's testimony, Wintoll's evidence relating to lost profits consisted of the testimony of Leon Winitsky and Michael Winitsky, principals of Wintoll, and a calculation by Wintoll of its estimated profits. The day after Seymour's testimony was stricken, Wintoll accepted a settlement offer from the federal defendants for approximately $750,000. Jackson–Cross subsequently provided Wintoll with a corrected computation of estimated lost profits, which indicated such damages amounted to $2.7 million.

On January 14, 1993, Wintoll filed a civil action in the Philadelphia County Common Pleas Court against Jackson–Cross, asserting causes of action for breach of contract and professional malpractice. Wintoll asserted that Jackson–Cross had breached its agreement to furnish expert services in connection with the federal lawsuit by failing to deliver an accurate or workmanlike lost profits computation, and had failed to exercise the degree of care and skill ordinarily exercised by experts in the field of real estate counselling and computation of lost profits in real estate transactions. Wintoll alleged that it would have received a judgment for lost profits in an amount in excess of $2.7 million plus interest but for the conduct of Jackson–Cross. Wintoll sought damages for the estimated lost profits and reimbursement of the fees paid to Jackson–Cross for its services.

Jackson–Cross filed preliminary objections in the nature of a demurrer to the complaint, which were overruled. In its answer and new matter, Jackson–Cross asserted, inter alia, that Wintoll's causes of action were barred by the doctrine of witness immunity.[1] The immunity issue was then raised by Jackson–Cross in a motion for judgment on the pleadings. The motion was denied. Jackson–Cross renewed the issue in a motion for summary judgment, which was also denied. On June 7, 1996, an order was entered by the common pleas court denying reconsideration of the summary judgment motion.

On July 1, 1996, Jackson–Cross filed a second motion for summary judgment. Jackson–Cross asserted that (1) Wintoll's claim was non-justiciable because the federal action had been settled prior to a jury verdict; (2) Wintoll's settlement of the federal action severed the causal link between the striking of Seymour's testimony and the alleged damages; (3) the pro tanto release given by Wintoll to the additional defendant applied to Jackson–Cross as an agent; and (4) Wintoll had failed to state a claim for breach of contract. The second

1. Jackson–Cross also joined Wintoll's legal counsel in the federal action, Robert Swift, Esquire and his law firm, Kohn, Nast & Graf, as additional defendants. Wintoll subsequently executed a pro tanto release in favor of the additional defendants.

summary judgment motion was granted by order dated July 10, 1996. Judgment was entered in favor of Jackson–Cross and the case was dismissed.[2]

On appeal, the Superior Court affirmed the order granting summary judgment on different grounds.[3] The Superior Court concluded that the doctrine of witness immunity barred Wintoll's action against Jackson–Cross. We granted Wintoll's petition for allowance of appeal to address the issue of whether the doctrine of witness immunity extends to bar professional malpractice actions against professionals hired to perform services related to litigation.

Wintoll challenges the ruling of the Superior Court, asserting that the witness immunity doctrine should not be extended so as to bar professional malpractice actions against an expert retained by a party to litigation.[4] Wintoll contends that privately retained and compensated experts should not be

2. The common pleas court granted the motion on the basis that Wintoll would not be able to establish a causal link between Jackson–Cross's alleged negligence and failing to obtain a jury verdict for lost profits. The court also found that the complaint failed to state a claim for breach of contract, but rather alleged professional negligence. The court found no merit in Jackson–Cross's argument concerning the release and did not address the justiciability argument.

   The court did not reconsider the application of the doctrine of witness immunity, finding that further review of the issue was precluded because the issue had been considered in the original summary judgment motion.

3. The Superior Court found that the common pleas court had properly declined to revisit the witness immunity issue, but observed that it was within its province as an appellate court to affirm the lower court's order if it were correct on any legal ground or theory, citing Al Hamilton Contracting Co. v. Cowder, 434 Pa.Super. 491, 644 A.2d 188 (1994). The Superior Court did not address the alternative grounds for the decision of the common pleas court.

4. The issue of whether the witness immunity doctrine bars professional malpractice actions against a court-appointed expert witness was addressed by the Superior Court in Clodgo v. Bowman, 411 Pa.Super. 267, 601 A.2d 342 (1992), appeal granted, 532 Pa. 640, 614 A.2d 1138 (1992), appeal dismissed as having been improvidently granted, 533 Pa. 352, 625 A.2d 612 (1993), (holding that witness immunity doctrine insulates a court-appointed expert witness from liability premised upon medical malpractice). The applicability of the doctrine to a court-appointed expert witness is not squarely before this Court, and we will leave that question for another day.

immunized from their own negligence, and that the policy concerns underlying the witness immunity doctrine are not advanced by extending immunity under such circumstances. Jackson–Cross asserts that the Superior Court's decision should be affirmed because it is based upon sound public policy.

In *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53 (1971), we recognized, in the context of a defamation action, that participants in judicial proceedings have an absolute privilege for communications related to the proceedings.

> [S]tatements by a party, a witness, counsel, or a judge cannot be the basis of a defamation action whether they occur in the pleadings or in open court.

> The reasons for the absolute privilege are well recognized. A judge must be free to administer the law without fear of consequences. This independence would be impaired were he to be in daily apprehension of defamation suits. The privilege is also extended to parties to afford freedom of access to the courts, to witnesses to encourage their complete and unintimidated testimony in court, and to counsel to enable him to best represent his client's interests. Likewise, the privilege exists because the courts have other internal sanctions against defamatory statements, such as perjury or contempt proceedings.

275 A.2d at 56 (citation omitted). See also, *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 354 (1986) ("The origin of the rule was the great mischief that would result if witnesses in courts of justice were not at liberty to speak freely, subject only to the animadversion of the court. . . . The rule is inflexible that no action will lie for words spoken or written in the course of giving evidence.")

The United States Supreme Court addressed the policy concerns underlying the witness immunity doctrine in the oft-cited decision of *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 1112–1114, 75 L.Ed.2d 96 (1983) (footnotes and citations omitted):

The immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law. Some American decisions required a showing that the witness' allegedly defamatory statements were relevant to the judicial proceeding, but once this threshold showing had been made, the witness had an absolute privilege. The plaintiff could not recover even if the witness knew the statements were false and made them with malice.

In the words of one 19th-century court, in damages suits against witnesses, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." A witness' apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. Even within the constraints of the witness' oath there may be various ways to give an account or to state an opinion. These alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. But the truth-finding process is better served if the witness' testimony is submitted to "the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies."

The witness immunity doctrine has been applied by the Superior Court in actions other than for defamation when the court has determined that the extension of immunity is in furtherance of the policy underlying the doctrine. See *Clodgo v. Bowman*, 411 Pa.Super. 267, 601 A.2d 342, 345 (1992), appeal granted, 532 Pa. 640, 614 A.2d 1138 (1992), appeal

dismissed as having been improvidently granted, 533 Pa. 352, 625 A.2d 612 (1993), ("The form of the cause of action is not relevant to application of the privilege. Regardless of the tort contained in the complaint, if the communication was made in connection with a judicial proceedings [sic] and was material and relevant to it, the privilege applies.") *Moses v. McWilliams*, 379 Pa.Super. 150, 549 A.2d 950, 957 (1988) ("While it is true that immunity from civil liability in judicial proceedings has been applied most frequently in defamation actions, many courts, including those in Pennsylvania, have extended the immunity from civil liability to other alleged torts when they occur in connection with judicial proceedings.")

In this case, the Superior Court stated that it was required to analyze and decide the case in light of its decision in *Panitz v. Behrend*, 429 Pa.Super. 273, 632 A.2d 562 (1993), allocatur denied, 539 Pa. 694, 653 A.2d 1232 (1994). *Panitz* involved a medical doctor who was retained by a law firm to provide services as an expert witness in a lawsuit by plaintiffs who alleged that they had suffered from formaldehyde sensitization reactions due to exposure to formaldehyde in building materials. The law firm anticipated that the expert would be cross-examined about the lack of formaldehyde sensitization in cigarette smokers who regularly were exposed to much greater concentrations of formaldehyde than were the plaintiffs. Prior to trial, the expert provided the law firm with deposition transcripts from an unrelated case in which the expert had testified about the lack of sensitization in smokers.

At trial, the expert proffered her opinion that the plaintiffs' injuries had been caused by formaldehyde present in building materials. The expert conceded on cross-examination, however, that she could not explain the apparent inconsistency about the lack of sensitization in cigarette smokers. After trial, the expert indicated that she had realized before her testimony that her prior analysis of the lack of sensitization in cigarette smokers was inaccurate.

When a defense verdict was returned, the law firm refused to pay the expert for her services. The expert then brought an action to recover her fees. The law firm filed a counter-

claim seeking damages resulting from the defense verdict, alleging negligence and misrepresentation regarding the expert's trial testimony. Preliminary objections to the counterclaim were sustained and the counterclaim was dismissed.

The Superior Court affirmed the order dismissing the counterclaim, finding that the expert was immune from liability for the testimony which she gave. The court found that the policy of encouraging witnesses to give frank and truthful testimony would be advanced by application of the witness immunity doctrine. The court reasoned that the primary purpose of expert testimony was to assist the factfinder in understanding complicated matters, rather than to assist one party in winning a case. "Having testified truthfully in the judicial process, a witness should not thereafter be subjected to civil liability for the testimony which he or she has given." 632 A.2d at 563. The Superior Court concluded that liability could not be imposed upon an expert who is persuaded on cross-examination by conflicting evidence that some or all of the expert's opinion testimony was inaccurate.[5]

■ In this case, the Superior Court determined that *Panitz* was dispositive and concluded that the witness immunity doctrine bars Wintoll's professional negligence action against Jackson–Cross. We find *Panitz* to be distinguishable, however. In *Panitz*, the expert witness offered her opinion as to the

**5.** The Superior Court rejected an argument made in *Panitz* that the witness immunity rule should not apply to so-called "friendly experts", who are hired by a party to provide professional services in connection with litigation. In the absence of any guidance from this Court on the question, the Superior Court analyzed case law from other jurisdictions. The court adopted the reasoning of the Washington Supreme Court's plurality decision in *Bruce v. Byrne–Stevens & Associates Engineers, Inc.*, 113 Wash.2d 123, 776 P.2d 666 (1989), which held that absolute immunity extends to acts and statements of experts which arise in the course of or preliminary to judicial proceedings.

We note that the Washington Supreme Court has since held in *Deatherage v. State of Washington*, 134 Wash.2d 131, 948 P.2d 828 (1997) that absolute witness immunity does not extend to professional disciplinary proceedings of a state licensing board when the board initiates the proceeding based upon work performed as an expert witness in child custody cases. The court concluded that the policies that underscore witness immunity do not apply to disciplinary proceedings.

cause of the plaintiffs' formaldehyde sensitization but testified during cross-examination that she could not explain the lack of such sensitization in cigarette smokers. The theories that the expert witness had previously articulated to explain the inconsistency had been discounted by the expert prior to trial. While the expert's testimony on cross-examination may have defeated the expectation of plaintiffs' counsel that she would be able to account for the inconsistency, the expert offered her opinion based upon her knowledge of formaldehyde sensitization.

It is imperative that an expert witness not be subjected to litigation because the party who retained the expert is dissatisfied with the substance of the opinion rendered by the expert. An expert witness must be able to articulate the basis for his or her opinion without fear that a verdict unfavorable to the client will result in litigation, even where the party who has retained the expert contends that the expert's opinion was not fully explained prior to trial. Application of the witness immunity doctrine in *Panitz* was consistent, therefore, with the two-fold policy of the doctrine: to ensure that the path to the truth is left as free and unobstructed as possible and to protect the judicial process.

We are unpersuaded, however, that those policy concerns are furthered by extending the witness immunity doctrine to professional negligence actions which are brought against an expert witness when the allegations of negligence are not premised on the substance of the expert's opinion. We perceive a significant difference between *Panitz* and Wintoll's claim in this case that Jackson–Cross had been negligent in performing the mathematical calculations required to determine lost profits. The goal of ensuring that the path to truth is unobstructed and the judicial process is protected, by fostering an atmosphere where the expert witness will be forthright and candid in stating his or her opinion, is not advanced by immunizing an expert witness from his or her negligence in formulating that opinion. The judicial process will be enhanced only by requiring that an expert witness render services to the degree of care, skill and proficiency

commonly exercised by the ordinarily skillful, careful and prudent members of their profession.

■ Therefore, we find that the witness immunity doctrine does not bar Wintoll's professional malpractice action against Jackson–Cross. We caution, however, that our holding that the witness immunity doctrine does not preclude claims against an expert witness for professional malpractice has limited application. An expert witness may not be held liable merely because his or her opinion is challenged by another expert or authoritative source. In those circumstances, the judicial process is enhanced by the presentation of different views. Differences of opinion will not suffice to establish liability of an expert witness for professional negligence.

Accordingly, we reverse the order of the Superior Court and remand for disposition of the remaining issues.

Justice SAYLOR did not participate in the consideration or decision of this case.

Justice CAPPY files a dissenting opinion in which Justice CASTILLE joins.

CAPPY, Justice, dissenting.

The majority premises its opinion largely on its conclusion that the situation presented in the matter *sub judice* is distinguishable from that with which the Superior Court was faced in *Panitz v. Behrend,* 429 Pa.Super. 273, 632 A.2d 562 (1993). The majority categorizes the suit filed against the expert witness in *Panitz* as one which attacked the "substance" of the expert's opinion; in contrast, the majority asserts that the suit in the matter presently before the court is premised on the allegation that the expert was "negligen[t] in formulating [his] opinion." Majority op. at 306. The majority finds this distinction to be crucial. It concludes that while a suit may not be filed on the basis that the "substance" of an expert witness' testimony was unacceptable, an expert witness may be sued on the basis that the expert was negligent in formulating the opinion tendered at trial. In my opinion, the

majority's attempts to distinguish *Panitz* ring hollow. Furthermore, I believe that the distinction formulated by the majority is an unworkable and radical departure from our accepted law regarding witness immunity. I therefore am compelled to dissent.

In the underlying lawsuit in *Panitz*, the expert witness, Elaine Panitz ("Panitz"), tendered her medical opinion on direct examination in favor of the plaintiffs; this was in accord with her pre-trial communications with the Behrend firm which represented the plaintiffs in the underlying lawsuit. On cross-examination, however, Panitz conceded that her opinion was inconsistent with the available scientific data. After trial, Panitz admitted that she had realized prior to trial that her pro-plaintiffs medical opinion was inaccurate; yet Panitz had failed to inform the Behrend firm that she had changed her opinion.

Contrary to the majority's characterization of *Panitz*, I believe that the lawsuit filed against Panitz was premised on the allegation that she had been negligent in formulating her opinion, and was not an attack on the substance of the opinion she offered on cross-examination. In fact, there is a lengthy discussion in the Superior Court opinion concerning the contention by the Behrend firm in its suit against Panitz that "it was not the in-court testimony that caused the loss but the pre-trial representations about what the in-court testimony would be." *Panitz*, 632 A.2d at 565. Clearly, the Behrend firm sued Panitz premised upon Panitz's negligent failure to inform them that she had changed her opinion prior to trial; I see nothing in *Panitz* which would indicate that the Behrend firm sued Panitz on the basis that they somehow disagreed with the substance of her opinion.

Furthermore, I find that the test proposed by the majority is simply unworkable. In my opinion, there is no bright line between what constitutes an attack on the "substance" of an expert's opinion and what constitutes a challenge premised on the expert's negligence in formulating that opinion. I believe that there is a great gray area which lies between these two points, and distinguishing between them will be quite difficult.

This difficulty has, in my opinion, been amply illustrated by the varying analyses of *Panitz* offered by the majority and by this author in the matter *sub judice*. I fear that by establishing this unworkable distinction, we will be sowing confusion in the lower courts and the practicing bar.

Rather than adopting such a test, I would continue to adhere to our established rule that there is no civil liability for statements made by witnesses in a legal proceeding. This straightforward rule advances the laudable and long-recognized policy goal of "encourag[ing] [the witness'] complete and unintimidated testimony in court...." *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53, 56 (1971). Furthermore, I agree with the position as ably stated by the Superior Court in *Panitz* that there "is no reason for refusing to apply the privilege to friendly experts hired by a party." *Panitz*, 632 A.2d at 565. "To allow a party to litigation to contract with an expert witness and thereby obligate the witness to testify only in a manner favorable to the party, on threat of civil liability, would be contrary to public policy." *Id.* at 565–66.

For the foregoing reasons, I respectfully dissent.

Justice CASTILLE joins this dissenting opinion.