565 S.E.2d 386

**Marybeth DAVIS, an incarcerated person by her next friend and her power of attorney, Gary DAVIS, Plaintiff Below, Appellant,**

**Paul S. Detch, Attorney, Appellant,**

v.

**Gregory WALLACE; Irvin Sopher; Elizabeth Scharman; Anne Hooper; Basil Zitelli; and Dorothy Becker, Defendants Below, Appellees,**

**State of West Virginia, Intervenor Below, Appellee.**

**No. 29966.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 9, 2002.

Decided April 26, 2002.

Dissenting Opinion by Chief Justice Davis May 8, 2002.

Concurring Opinion of Justice Starcher July 3, 2002.

Paul S. Detch, Esq., Lewisburg, for Appellants.

Eric A. Collins, Esq., Pullin, Knopf, Fowler & Flanagan, Beckley, for Irwin Sopher and Anne Hooper.

Stephen M. Houghton, Esq., Dickie, McCamey & Chilcote, Wheeling, for Basi Zitelli and Dorothy Becker.

Charles R. Bailey, Esq., John T. Molleur, Esq., Bailey & Wyant, Charleston, for Gregory Wallace.

George A. Daugherty, Esq., Elkview, for Elizabeth Scharman.

Robert Kevin Hanson, Prosecuting Attorney, Greenbrier County, Lewisburg, for Appellee State of West Virginia.

PER CURIAM.

The appellant, Marybeth Davis, who is currently incarcerated, appeals from an order of the Circuit Court of Greenbrier County awarding sanctions in the amount of $8,500.00 against the appellant Marybeth Davis, her next friend Gary Davis, and their attorney, Paul S. Detch.

I.

On September 15, 1999, the appellant by her next friend, Gary Davis, sued the appellees, Drs. Gregory Wallace, Irvin Sopher, Elizabeth Scharman, Anne Hooper, Basi Zitelli, and Dorothy Becker, for their conduct in connection with the appellant's criminal

trial.[1] Specifically, she alleged that the doctors, as expert witnesses for the State, had negligently performed tests, negligently prepared for testimony, negligently testified, and otherwise failed to meet the "standards of science and medicine as it existed at that time."

In response to the lawsuit, the appellees filed motions to dismiss for failure to state a claim upon which relief could be granted pursuant to *West Virginia Rules of Civil Procedure,* Rule 12(b)(6) [1998]. The Circuit Court of Greenbrier County granted the appellees' motions to dismiss, finding that none of the causes of action stated against the appellees were viable under existing state law.

The appellees thereafter filed motions for sanctions against the appellants and their counsel. The circuit court granted the appellees' motions for sanctions, finding as a matter of law that the claims and other legal contentions made by the appellants were not warranted by existing law, nor did they constitute a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law pursuant to Rule 11(b) of the *West Virginia Rules of Civil Procedure* [1998].

The circuit court further held that the claims and other legal contentions made in the appellant's complaint were frivolous in nature, and that the allegations and other factual contentions made in the complaint did not have any evidentiary support, nor were they likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Finally, the circuit court found that the appellants filed the lawsuit with a vexatious, wanton, or oppressive intent to intimidate the appellees regarding their testimony at any post-trial hearing in the criminal case, or to seek to punish them for their testimony at the criminal trial.

The circuit court awarded attorneys' fees and related expenses against the appellants, Marybeth Davis and Gary Davis, and their

attorney, Paul S. Detch, jointly and severally, in the amount of $8,500.00 as sanctions for their conduct. The trial court had previously dismissed the appellants' lawsuit against the appellees.

The appellants and their attorney now appeal the circuit court's order.

## II.

This Court reviews a trial court's assessment of sanctions under an abuse of discretion standard. "The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence and the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard." Syllabus Point 1, *McDougal v. McCammon,* 193 W.Va. 229, 455 S.E.2d 788 (1995). "A trial court abuses its discretion if its ruling is based on an erroneous assessment of the evidence or the law." *Bartles v. Hinkle,* 196 W.Va. 381, 389, 472 S.E.2d 827, 835 (1996) (discussing the trial court's imposing a $10,000.00 sanction against a party who repeatedly failed to comply with the trial court's discovery orders).

Rule 11(b) of the *West Virginia Rules of Civil Procedure* provides that:

By presenting to the court . . . a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument

---

1. On September 15, 1997, Marybeth Davis was convicted of the attempted poisoning by insulin of her son and the murder of her daughter by

caffeine. *See State v. Davis,* 205 W.Va. 569, 519 S.E.2d 852 (1999).

for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, [if] specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

*West Virginia Rules of Civil Procedure,* Rule 11(b) [1998].

An important purpose of Rule 11 of the *West Virginia Rules of Civil Procedure* is to prevent frivolous lawsuits or lawsuits filed for an improper purpose. "The purpose of Rule 11 and Rule 37 of the West Virginia Rules of Civil Procedure is to allow trial courts to sanction parties who do not meet minimum standards of conduct in a variety of circumstances." *Bartles v. Hinkle,* 196 W.Va. at 389, 472 S.E.2d at 835. Rule 11 with its possible sanctions "deters much frivolous litigation (thereby conserving judicial resources), compensates the victims of vexatious litigation, and educates the bar about appropriate standards of conduct." Alan E. Untereiner, Note, *A Uniform Approach to Rule 11 Sanctions,* 97 Yale Law Journal 901, 902 (1988) (footnotes omitted).

▉▉▉ West Virginia trial courts have the authority to sanction parties that file frivolous lawsuits. "A court may order payment by an attorney to a prevailing party reasonable attorney fees and costs incurred as the result of his or her vexatious, wanton, or oppressive assertion of a claim or defense that cannot be supported by a good faith argument for the application, extension, modification, or reversal of existing law." Syllabus, *Daily Gazette Co., Inc. v. Canady,* 175 W.Va. 249, 332 S.E.2d 262 (1985). However, there are some limitations on a trial court's ability to levy sanctions:

In formulating the appropriate sanction, a court shall be guided by equitable principles. Initially, the court must identify the alleged wrongful conduct and determine if it warrants a sanction. The court must explain its reasons clearly on the record if it decides a sanction is appropriate. To determine what will constitute an appropriate sanction, the court may consider the seriousness of the conduct, the impact the conduct had in the case and in the administration of justice, any mitigating circumstances, and whether the conduct was an isolated occurrence or was a pattern of wrongdoing throughout the case.

Syllabus Point 2, *Bartles v. Hinkle, supra.*

▉▉▉ At the heart of this case is the issue of whether the appellants filed a "frivolous" lawsuit that was neither grounded in existing state law nor was "a good faith argument for the application, extension, modification, or reversal of existing law."

The appellants took the novel approach of suing the opposing party's expert witnesses for negligence and malpractice. The appellants claimed that the expert witnesses (among other alleged acts of misconduct) mishandled tissue samples, mislabeled and misread tissue samples, and concealed evidence that would have been useful in the defense of appellant Marybeth Davis in the underlying criminal action. The appellants argued that expert witnesses who commit negligence in pre-trial preparation of reports and on the witness stand should be held liable for their mistakes.

The law regarding witness immunity is sparse in West Virginia, and the issue of expert witness immunity has not been addressed by this Court. Historically, in West Virginia and in other jurisdictions, witnesses have been regarded as having an absolute immunity regarding their testimony given during a trial. This immunity encourages witnesses "to speak freely without the specter of subsequent retaliatory litigation for their good faith testimony. The immunity was created at common law to shield the percipient [fact] witness who was called into court to testify as to what he saw, heard, or did that was relevant to an issue in the case." Christopher M. McDowell, Note, *Authorizing the Expert Witness to Assassinate Character for Profit: A Reexamination of the Testimonial Immunity of the Expert Witness,* 28 U. Mem L.Rev. 239, 275 (1997).

However, an emerging body of case law [2] and scholarly work [3] questions the granting of absolute immunity to expert witnesses for in-court testimony or out-of-court preparations for trial including compiling data and generating reports.

Courts that have contemplated allowing expert witnesses to be held liable for their negligent behavior find that the typical policy concerns that promote absolute immunity for fact witnesses do not apply to expert witnesses. Fact witnesses are often bystanders and are assumed to be unbiased. Expert witnesses, however, are generally "procured by parties to testify because the testimony is expected to benefit the party procuring the expert." Christopher M. McDowell, *supra*, 28 U. Mem. L.Rev. at 261. Discussing the policy concerns underlying witness immunity, the Pennsylvania Supreme Court noted that: "[t]he goal of ensuring that the path to truth is unobstructed . . . is not advanced by immunizing an expert witness from his or her negligence in formulating that opinion." *LLMD of Michigan, Inc. v. Jackson–Cross Co.*, 559 Pa. 297, 306, 740 A.2d 186, 191 (1999).

In *LLMD of Michigan, Inc. v. Jackson–Cross Co.*, 559 Pa. 297, 740 A.2d 186 (Pa. 1999), the Supreme Court of Pennsylvania expanded the liability of expert witnesses to include negligence in the preparation of testimony. The Pennsylvania Supreme Court found that witness immunity did not bar professional malpractice suits when the allegations of negligence were not premised on the substance of the expert's testimony but were premised on the expert's negligent preparation in reaching conclusions offered at trial, or on the expert's use of a faulty methodology. In considering the policy concerns underlying expert witness immunity, the Pennsylvania court found that witness immunity should not protect expert witnesses who do not "render services to the degree of care, skill, and proficiency commonly exercised by the ordinarily skillful, careful and prudent members of their profession." *Id.*, 559 Pa. at 306–307, 740 A.2d at 191.

A Louisiana court, also considering the different policy interests underlying witness immunity, noted:

> With no sanction for incompetent preparation, however, an expert witness is free to prepare and testify without regard to the accuracy of his data or opinion. We do not see how the freedom to testify negligently will result in more truthful expert testimony. Without some overarching purpose, it would be illogical, if not unconscionable, to shield a professional, who is otherwise held to the standards and duties of his or her profession, from liability for his or her malpractice simply because a party to a judicial proceeding has engaged that professional to provide services in relation to

---

**2.** See, e.g., *James v. Brown*, 637 S.W.2d 914 (Tex. 1982) (finding that the adverse expert-witness psychiatrist owed a statutory duty of care to the plaintiff); *Levine v. Wiss & Co.*, 97 N.J. 242, 478 A.2d 397 (1984) (holding that immunity would not protect an expert witness-accountant from a claim of negligent compilation of an appraisal for a judicial proceeding); *Mattco Forge, Inc. v. Arthur Young & Co.*, 5 Cal.App.4th 392, 6 Cal. Rptr.2d 781 (Ct.App.1992) (holding that witness immunity would not shield an expert witness-accounting firm from otherwise actionable professional malpractice); *Murphy v. A.A. Mathews*, a Div. of CRS Group Engineers, Inc., 841 S.W.2d 671 (Mo.1992) (*en banc*) (finding that an expert who provided negligent litigation support was not protected by witness immunity); *but see Bruce v. Byrne–Stevens & Associates Engineers, Inc.*, 113 Wash.2d 123, 776 P.2d 666 (1989) (holding the expert witnesses were protected by witness immunity to ensure expert objectivity).

**3.** Mary Virginia Moore, Gary G. Johnson and Deborah F. Beard, *Liability in Litigation Support and Courtroom Testimony: Is it Time To Rethink the Risks?*, 9 J. Legal Econ. 53 (Fall 1999); Leslie R. Masterson, *Witness Immunity or Malpractice Liability for Professionals Hired as Expert?*, 17 Rev. Litig. 393 (1998); Douglas R. Richmond, *The Emerging Theory of Expert Witness Malpractice*, 22 Cap. U.L.Rev. 693, 694 (1993); W. Raley Alford, III, Comment, *The Biased Expert Witness in Louisiana Tort Law: Existing Mechanisms of Control and Proposals for Change*, 61 La. L.Rev. 181 (2000); Eric G. Jensen, Comment, *When "Hired Guns" Backfire: The Witness Immunity Doctrine and the Negligent Expert Witness*, 62 UMKC L.Rev. 185 (1993); Randall K. Hanson, *Witness Immunity Under Attack: Disarming "Hired Guns,"* 31 Wake Forest L.Rev. 497 (1996); *but see* Adam J. Myers III, *Misapplication of the Attorney Malpractice Paradigm to Litigation Services: "Suit within a Suit" Shortcomings Compel Witness Immunity for Experts*, 25 Pepperdine L.Rev. 1 (1997).

the judicial proceeding and that professional testifies by affidavit or deposition.

*Marrogi v. Howard*, 805 So.2d 1118, 1133 (La.2002) (holding that witness immunity does not bar a claim against a retained expert witness for negligence performance of his duty).

Many courts, of course, have been understandably unwilling to allow a party to sue the opposing party's expert witness for malpractice or negligence, in part because there is no reliance between the expert witness and the opposing party and because of the fear of retaliatory lawsuits. *See, e.g.,* Jeffrey L. Harrison, *Reconceptualizing the Expert Witness: Social Costs, Current Controls, and Proposed Responses,* 18 Yale J. on Reg. 253 (2001); Douglas R. Pahl, Casenote, *Absolute Immunity for the Negligent Expert Witness: Bruce v. Byrne–Stevens,* 26 Willamette L.Rev. 1051 (1990). However, at least one law review article argues that "[i]t should not be unreasonable, however, for a litigant to expect an adverse expert witness to observe the same standard of care applicable outside the context of litigation services." W. Raley Alford, III, Comment, *The Biased Expert Witness in Louisiana Tort Law: Existing Mechanisms of Control and Proposals for Change,* 61 La. L.Rev. 18 (2000).

The rulings of other jurisdictions holding that expert witnesses may be held liable in some circumstances for their negligent preparation of evidence or opinions offered in court and various scholarly works on the subject of witness immunity demonstrate a good faith argument for extension of the law of witness immunity in West Virginia.

West Virginia law is not settled in the area of expert witness immunity and, at this time, we are not addressing the issue of witness immunity. We are simply addressing whether a trial judge, who correctly identified the current state of law in West Virginia, abused his discretion by sanctioning a litigant and her attorney for expounding a novel cause of action that is not currently recognized in West Virginia.

■ Among jurisdictions that have addressed the issue of expert witness malpractice, there is a plurality of opinions. Therefore, the appellants cannot be found to have made their claim in bad faith because bad faith requires "the assertion of a claim or defense that cannot be supported by a good faith argument for the application, extension, modification, or reversal of existing law." *See Newcome v. Turner,* 179 W.Va. 309, 367 S.E.2d 778 (1988) *(per curiam )* (holding that the plaintiffs could not be accused of bad faith when asserting a claim in an unsettled area of West Virginia law).

### III.

We therefore find that the trial court abused its discretion in sanctioning the appellants. We reverse the trial court's levying of sanctions in the form of attorneys' fees and related expenses, and remand this case for the entry of an order in accordance with this opinion.

Reversed and Remanded.

DAVIS, Chief Justice, dissenting.

(Filed May 8, 2002)

This Court serves as a lighthouse whose beacon guides the bench and bar by clarifying the proper procedures to follow in civil proceedings prosecuted in the courts of this State. Rather than shining brightly and providing clear guidance on the Rule 11 issue presented by this appeal, however, the majority of my colleagues have allowed this flame to flicker. In the water's murky darkness, schools of attorneys and litigants may now prey on unsuspecting experts, while parties who rely on expert testimony watch helplessly from the shore. Although the Court attempts to conceal the impact of its decision by rendering it as a per curiam opinion,[1] the majority's decision nevertheless

---

1. Such an attempt to lessen the precedential weight of a decision by rendering it per curiam, however, cannot be successful in light of the Court's recent revision of its treatment of such opinions. *Compare* Syl. pts. 3–4, *Walker v. Doe,* 210 W.Va. 490, 558 S.E.2d 290 (2001) (Syl. pt.

3: "Per curiam opinions have precedential value as an application of settled principles of law to facts necessarily differing from those at issue in signed opinions. The value of a per curiam opinion arises in part from the guidance such decisions can provide to the lower courts regard-

will have future consequences so far-reaching as to virtually eradicate the term "frivolous lawsuit" from this State's legal vocabulary while effectively precluding the pursuit of lawsuits designed to redress real and compensable injuries. The immediate impact of the majority's decision, though, is just as grave. By rendering its ruling, the majority has not only missed the boat by failing to appreciate the frivolity of the appellant's lawsuit; it simultaneously has stirred up a frightful storm at sea by allowing a criminal defendant to sue the State's expert witnesses. For the reasons set forth below, I dissent.

## I. Rule 11 Sanctions Frivolous Lawsuits

"The purpose of Rule 11 ... of the West Virginia Rules of Civil Procedure is to allow trial courts to sanction parties who do not meet minimum standards of conduct[.]" *Bartles v. Hinkle*, 196 W.Va. 381, 389, 472 S.E.2d 827, 835 (1996) (citation omitted). In this regard, Rule 11 succinctly states, in pertinent part, that

> [b]y presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an[ ] attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances,
>
> . . . .
>
> the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[.]

W. Va. R. Civ. P. 11(b)(2). Failure to follow these directives could, subject to the presiding court's discretion, result in the imposition of sanctions: "If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated,

the court may ... impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." W. Va. R. Civ. P. 11(c). In other words, if a filing (1) is not warranted by existing law or (2) does not present a meritorious argument to extend, modify, or reverse existing law or to create new law, the court in which such filing has been made may assess sanctions against the individual(s) responsible for such frivolous filing. Sanctionable conduct includes the "vexatious, wanton, or oppressive assertion of a claim or defense that cannot be supported by a good faith argument for the application, extension, modification, or reversal of existing law." Syl., in part, *Daily Gazette Co., Inc. v. Canady*, 175 W.Va. 249, 332 S.E.2d 262 (1985).

" 'Because of their very potency, ... [sanction] powers must be exercised with restraint and discretion. A primary aspect of ... [a circuit court's] discretion is the ability to fashion an *appropriate* sanction for conduct which abuses the judicial process.' " *Cox v. State*, 194 W.Va. 210, 218, 460 S.E.2d 25, 33 (1995) (per curiam) (Cleckley, J., concurring) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 2132–33, 115 L.Ed.2d 27, 45 (1991) (citation omitted; emphasis added)). To guide circuit courts' exercise of such discretion, this Court has established guidelines to be followed when frivolous filings suggest that the imposition of sanctions may be warranted.

> Although Rule[ ] 11 ... of the West Virginia Rules of Civil Procedure do[es] not formally require any particular procedure, before issuing a sanction, a court must ensure it has an adequate foundation either pursuant to the rules or by virtue of its inherent powers to exercise its authority. The Due Process Clause of Section 10 of Article III of the West Virginia Constitution requires that there exist a relation-

ing the proper application of the syllabus points of law relied upon to reach decisions in those cases."; Syl. pt. 4: "A per curiam opinion may be cited as support for a legal argument.") *with Lieving v. Hadley*, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992) (*"Per curiam* opinions ... are used to decide only the specific case before the Court; everything in a *per curiam*

opinion beyond the syllabus point is merely *obiter dicta*. A *per curiam* opinion that appears to deviate from generally accepted rules of law is not binding on the circuit courts, and should be relied upon only with great caution. . . . [I]f rules of law or accepted ways of doing things are to be changed, then this Court will do so in a signed opinion, not a *per curiam* opinion.").

ship between the sanctioned party's misconduct and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case. Thus, a court must ensure any sanction imposed is fashioned to address the identified harm caused by the party's misconduct.

Syl. pt. 1, *Bartles v. Hinkle*, 196 W.Va. 381, 472 S.E.2d 827.

In formulating the appropriate sanction, a court shall be guided by equitable principles. Initially, the court must identify the alleged wrongful conduct and determine if it warrants a sanction. The court must explain its reasons clearly on the record if it decides a sanction is appropriate. To determine what will constitute an appropriate sanction, the court may consider the seriousness of the conduct, the impact the conduct had in the case and in the administration of justice, any mitigating circumstances, and whether the conduct was an isolated occurrence or was a pattern of wrongdoing throughout the case.

Syl. pt. 2, *id.*

Applying the above-cited authorities, my colleagues have determined that Ms. Davis' lawsuit was not frivolous, and, accordingly, that sanctions were not warranted. Based upon the analysis which follows, however, I disagree with the majority's conclusion that the appellant advanced a nonfrivolous argument for the extension and/or modification of existing law. Instead, I agree with the circuit court's ruling that Ms. Davis' lawsuit was totally devoid of merit and concur with the sanctions imposed by that court.

## II. Ms. Davis' Lawsuit against the State's Expert Witnesses is Frivolous

Rule 11(b)(2) of the West Virginia Rules of Civil Procedure precludes lawsuits, filings, and legal claims that are not warranted by existing law or that constitute a frivolous "argument for the extension, modification, or reversal of existing law or the establishment of new law." The majority's decision in the case *sub judice* found that Ms. Davis' lawsuit against the State's experts did not violate Rule 11(b)(2)'s directives, and thus was not

sanctionable. A review of the applicable law, however, requires a contrary conclusion.

### A. No Meritorious Argument Can Be Made to Permit a Criminal Defendant to Sue a State's Expert

If one simply reads the majority opinion, without more, it seems that other jurisdictions have approved the type of lawsuit filed in this case. Consequently, it superficially seems that the majority opinion was correct in determining that a good faith basis existed for the filing of the lawsuit against the experts. Unfortunately, the majority opinion distorts the cases upon which it relies. In not one case cited by the majority opinion did a court permit a convicted criminal defendant to file a civil lawsuit against experts which testified on behalf of the prosecutor. In fact, none of the cases cited even addressed the issue.

1. *James v. Brown.* The majority opinion first cites *James v. Brown*, 637 S.W.2d 914 (Tex.1982) (per curiam). *James* involved a lawsuit filed by a plaintiff alleging, among other things, malpractice against three psychiatrists who generated a report that diagnosed the plaintiff as mentally ill. The report was used by the plaintiff's children at a mental health proceeding in their unsuccessful effort to have the plaintiff involuntarily committed to a mental health facility. The trial court dismissed the plaintiff's lawsuit, but the Supreme Court of Texas reversed. Upholding the lawsuit, the Texas Supreme Court held that the plaintiff was "not prevented from recovering from the doctors for negligent misdiagnosis-medical malpractice merely because their diagnoses were later communicated to a court in the due course of judicial proceedings." *James*, 637 S.W.2d at 918. In addition, the *James* opinion referred to a statute that permitted the plaintiff's lawsuit, holding that "[t]he plain implication of [the statute] is that persons acting in bad faith, unreasonably, and negligently in connection with mental health proceedings are not free from liability." *Id.*

The majority opinion cites to *James* as supporting the proposition that a convicted criminal defendant can bring a civil lawsuit against experts testifying for the prosecutor. However, it is crystal clear that *James* never

came close to the exact issue before this Court. Rather, *James* related to a plaintiff's right to file a lawsuit against psychiatrists who misdiagnosed the plaintiff's mental health.

**2. *Levine v. Wiss & Co.*** Next, the majority cites *Levine v. Wiss & Co.*, 97 N.J. 242, 478 A.2d 397 (1984), which addressed

> whether an accountant, selected by the litigants in a contested matrimonial case and appointed by the court to act as an "impartial expert" in rendering a binding valuation of a business asset for purposes of equitable distribution, should be held liable for negligence in deviating from accepted standards applicable to the accounting profession.

*Levine*, 97 N.J. at 244, 478 A.2d at 398. The defendants in *Levine* argued that because they had been appointed by the trial court and the litigants had agreed to be bound by their report, these factors "elevated them beyond the status of accountants to the quasi-judicial role of 'arbitrators,' who would generally be shielded from private actions for damages brought by the parties to a given dispute." *Levine*, 97 N.J. at 247, 478 A.2d at 399. Nevertheless, the *Levine* court rejected the defendants' contention and held that the defendants "did not remotely resemble arbitrators when they performed their assigned function, and, accordingly, they are not entitled to immunity from legal responsibility for any malfeasance." *Levine*, 97 N.J. at 251, 478 A.2d at 402 (citations omitted). The court in *Levine* found that the "[d]efendants simply rendered a singular determination—a finding of fact by which the parties had agreed to be bound." *Id.*

The majority opinion in *Davis* cites to *Levine* as supporting the proposition that a convicted criminal defendant can file a civil lawsuit against experts who testify for the prosecutor. However, it is clear that *Levine* never addressed that exact issue. *Levine* was concerned with whether or not accountants could use the immunity granted to arbitrators, in an effort to escape liability for their negligence in valuing property on behalf of both parties in a divorce proceeding.

**3. *Mattco Forge, Inc. v. Arthur Young & Co.*** The third case to which the majority

opinion cites is *Mattco Forge, Inc. v. Arthur Young & Co.*, 6 Cal.Rptr.2d 781, 5 Cal. App.4th 392 (1992). In *Mattco,* the plaintiff brought a lawsuit against accountants that the plaintiff had hired as experts in a prior civil lawsuit, alleging that they had performed negligently. The trial court dismissed the action, but the appellate court reversed and reinstated the plaintiff's case. In doing so, the appellate court held that expert witness immunity "does not exist to protect one's own expert witnesses, but [is designed] to protect adverse witnesses from suit by opposing parties after the lawsuit ends." *Mattco,* 6 Cal.Rptr.2d at 789, 5 Cal. App.4th at 405.

Erroneously, the majority opinion cites *Mattco* as supporting the proposition that a convicted criminal defendant can bring a civil lawsuit against experts testifying for the prosecution. However, this issue was not before the appellate court in *Mattco.* More importantly, *Mattco* referenced with approval a prior decision of that court which expressly *prohibited* a criminal defendant from filing a civil lawsuit against an expert who erroneously testified to facts for the prosecutor. *See Block v. Sacramento Clinical Labs, Inc.,* 182 Cal.Rptr. 438, 131 Cal.App.3d 386 (1982).

**4. *Murphy v. A.A. Mathews.*** The majority opinion also cites *Murphy v. A.A. Mathews,* 841 S.W.2d 671 (Mo.1992) (en banc). *Murphy* involved a lawsuit brought by the plaintiff against an engineering expert, who had earlier been retained by the plaintiff for an arbitration proceeding. In the lawsuit, the plaintiff contended that the engineering expert had negligently performed work in the earlier proceeding. The trial court dismissed the case, but the Supreme Court of Missouri reversed. In doing so, the *Murphy* court held that "we do not believe that [expert witness] immunity was meant to or should apply to bar a suit against a privately retained professional who negligently provides litigation support services." *Murphy,* 841 S.W.2d at 680 (footnote omitted).

The majority opinion cites to *Murphy* as supporting the proposition that a convicted criminal defendant can bring a civil lawsuit against experts testifying for the prosecution.

However, it is clear that *Murphy* never addressed that exact issue. On the contrary, *Murphy* was concerned with whether a plaintiff could sue an expert retained by the plaintiff for litigation purposes.

**5. *LLMD of Michigan, Inc. v. Jackson-Cross Co.*** The majority opinion additionally relies upon the decision in *LLMD of Michigan, Inc. v. Jackson-Cross Co.*, 559 Pa. 297, 740 A.2d 186 (1999). LLMD brought a professional malpractice action against a company it hired to provide expert services in a federal lawsuit regarding lost profits. The trial court dismissed the case, but the Supreme Court of Pennsylvania reversed. By so ruling, the Pennsylvania court held that witness immunity did not preclude a party who retained an expert from suing that expert "when the allegations of negligence are not premised on the substance of the expert's opinion ... [but on] negligen[ce] in performing the mathematical calculations required to determine lost profits." *LLMD*, 559 Pa. at 306, 740 A.2d at 191.

The majority opinion cites to *LLMD* as supporting the proposition that a convicted criminal defendant can bring a civil lawsuit against experts testifying for the prosecution. It is clear, however, that *LLMD* never addressed that exact issue. *LLMD* was limited to the issue of whether or not a plaintiff could sue its own expert retained for litigation purposes.

**6. *Marrogi v. Howard.*** Lastly, the majority opinion cites to the decision in *Marrogi v. Howard*, 805 So.2d 1118 (La.2002). *Marrogi* involved a plaintiff who sued a medical billing analyst. In that case, the plaintiff alleged that the analyst breached its contract to provide medical billing, coding analysis and expert testimony in connection with the plaintiff's prior litigation. The trial court dismissed the action, but the Supreme Court of Louisiana reversed. *Marrogi* accurately recognized that courts around the country have held that "an adverse expert witness [is] immune from a retaliation suit filed by the losing party in the earlier litigation." *Marrogi*, 805 So.2d at 1126. However, in reversing the trial court, *Marrogi* held that "no overarching public purpose is served by applying witness immunity to shield a retained expert witness from a claim subsequently asserted by the party who hired him when the claim alleges deficient performance of his professional and contractual duties to provide litigation support services." *Marrogi*, 805 So.2d at 1129.

Erroneously, the majority opinion cites *Marrogi* as supporting the proposition that a convicted criminal defendant could bring a civil lawsuit against experts testifying for the prosecution. Clearly, *Marrogi* never addressed that exact issue. *Marrogi* was limited to the issue of whether or not a plaintiff could sue its own expert witness that had been retained for litigation purposes.

In summary, the majority opinion cites six cases allegedly supporting the proposition that a convicted criminal defendant can bring a civil lawsuit against experts testifying for the prosecutor. Yet, *not one* of these cited cases addresses the issue of a litigant bringing a negligence lawsuit against an expert retained by the opposing party in a prior case. With the exception of one case, *James v. Brown*, all of the other cases relied upon by the majority opinion involved lawsuits by plaintiffs who were suing *their own* experts retained in prior litigation.[2] Thus, the majority opinion has failed to cite *any* judicial decision in the country that would allow a convicted criminal defendant to bring a civil lawsuit against experts testifying for the prosecution. Given this lack of authority, I find it impossible to accept the majority's conclusion that Ms. Davis has asserted a nonfrivolous argument to establish a new cause of action in this State.

Aside from the six cases cited by the majority to justify its decision, it is readily apparent that no authority whatsoever, either judicial or statutory, supports Ms. Davis' claims. As is evident from the decision in *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the law in this country is well-settled and quite clear: a convicted criminal defendant cannot bring a

---

**2.** The decision in *James v. Brown* involved an action for misdiagnosis, by the plaintiff's own psychiatrists during a mental health proceeding, that was permitted by statute. *See James v. Brown*, 637 S.W.2d 914, 918 (Tex.1982) (per curiam).

civil lawsuit against witnesses testifying for the prosecutor on a theory of negligent testimony. The decision in *Briscoe* involved a federal Civil Rights Act lawsuit that was filed by convicted state defendants against state and local police officers, seeking damages based on alleged giving of perjured testimony at the defendants' criminal trials. The lower courts dismissed the action, and the United States Supreme Court affirmed. In doing so, the Court said that the doctrine of witness immunity was derived from the common law and is based on the idea that "the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Briscoe*, 460 U.S. at 333, 103 S.Ct. at 1114, 75 L.Ed.2d at 106 (internal citation and quotations omitted). *Briscoe* followed the law in the nation and held that because the statements were made in the courtroom, the witnesses would receive absolute immunity for all statements that were "relevant to the judicial proceeding." *Briscoe*, 460 U.S. at 331, 103 S.Ct. at 1113, 75 L.Ed.2d at 105 (footnote omitted).

In addition to the common law protection afforded all of the expert witnesses who testified for the State in prosecuting Ms. Davis, those witnesses who testified as to the victim's cause of death in the criminal case were protected from civil litigation by W. Va.Code § 16–10–3 (1989) (Repl.Vol.2001), which provides:

> A physician or any other person authorized by law to determine death who makes such determination in accordance with section one [§ 16–10–1] of this article is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his acts or the acts of others based on that determination. Any person who acts in good faith in reliance on a determination of death is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for such act.

It is patently obvious, then, that there is no authority to support the majority's conclusion that Ms. Davis' lawsuit constituted a good faith argument to extend the law.

### B. No Existing Law Supports Ms. Davis' Lawsuit

Just as the cases relied upon by the majority fail to present a good faith, meritorious argument to extend existing law or to create a new cause of action, so, too, do the circumstances surrounding Ms. Davis' lawsuit preclude a finding that such claims are supported by existing law. During its consideration of Ms. Davis' suit against the State's expert witnesses, whose testimony contributed to her criminal conviction,[3] the circuit court examined no less than seven legal theories and principles of law, all of which bar her cause of action.

First, the circuit court determined that the experts retained by the State were protected by principles of witness immunity. *See Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Higgins v. Williams Pocahontas Coal Co.*, 103 W.Va. 504, 138 S.E. 112 (1927). Next, the court ruled that Ms. Davis' action was barred by the statute of limitations set forth in W. Va.Code § 55–2–12 (1959) (Repl.Vol.2000). The third ground relied upon by the circuit court to dismiss Ms. Davis' complaint was its filing after the expiration of the one year statute of limitations for libel or slander. *See* W. Va.Code § 55–7–8a (1959) (Repl.Vol.2000); *Rodgers v. Corporation of Harpers Ferry*, 179 W.Va. 637, 640, 371 S.E.2d 358, 361 (1988). Additionally, the circuit court determined that Ms. Davis' lawsuit was barred by collateral estoppel due to the final resolution of her criminal conviction, upon which her civil lawsuit was based. *See State v. Davis*, 205 W.Va. 569, 519 S.E.2d 852 (1999); *Baber v. Fortner by Poe*, 186 W.Va. 413, 421, 412 S.E.2d 814, 822 (1991). The circuit court also found that dismissal was appropriate because "there is no cause of action for deviation [from] the standard of care under the Medical Professional Liability Act ... while testifying in a criminal case." *See* W. Va.Code § 55–7B–4 (1986) (Repl.Vol. 2000). A sixth basis for halting Ms. Davis' prosecution of her claims addressed by the circuit court was its lack of personal jurisdiction over defendant doctors Zitelli and Becker. *See* W. Va.Code § 56–3–33 (1997) (Supp.

---

**3.** Ms. Davis was convicted of the murder of her daughter and the attempted poisoning of her son.

*See State v. Davis*, 205 W.Va. 569, 519 S.E.2d 852 (1999) (affirming convictions and sentences).

2001). Finally, the court deemed Ms. Davis' lawsuit to be improper based upon her failure to appeal the court's earlier ruling dismissing her claims against the defendants and the tolling of the applicable appeals period.

Although Judge Jolliffe's well-reasoned order most certainly satisfies the due process consideration with which Justice Cleckley was concerned in *Bartles*,[4] the majority of the Court completely ignores this thorough analysis. Rather than dismissing the lower court's ruling, this Court should, at the very least, have heeded its own prior holding, which it quoted at length in its majority opinion, and accorded some modicum of discretion to the circuit court's decision to proclaim frivolous Ms. Davis' suit and impose appropriate sanctions. *See* Syl. pt. 1, in part, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995) ("[T]he West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making ... procedural rulings.... Absent a few exceptions, this Court will review ... procedural rulings of the circuit court under an abuse of discretion standard.").

## C. Ms. Davis' Lawsuit is Frivolous and Should Have Been Sanctioned Under Rule 11

Because of the absolute clarity of the law on this issue, I believe that the impact of the majority decision strips circuit courts of the authority to impose sanctions against parties filing frivolous lawsuits. I do not take this position lightly. Prior to this decision, our law was clear. Sanctions may be imposed against a party "as the result of his or her vexatious, wanton, or oppressive assertion of a claim or defense that cannot be supported by a good faith argument for the application, extension, modification, or reversal of exist-

ing law." Syl., in part, *Daily Gazette Co., Inc. v. Canady*, 175 W.Va. 249, 332 S.E.2d 262 (1985). *See, e.g., Pritt v. Suzuki Motor Co., Ltd.*, 204 W.Va. 388, 513 S.E.2d 161 (1998) (per curiam) (affirming sanctions against plaintiff for filing a baseless lawsuit); Syl. pt. 4, in part, *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554 (1996) (holding that a "circuit court has discretion [under Rule 11] to impose attorney's fees on litigants who bring vexatious and groundless lawsuits"). Additionally, this Court has held that "[t]he filing of frivolous and harassing litigation can lead to disciplinary sanctions including disbarment[.]" Syl. pt. 4, in part, *Committee on Legal Ethics of the West Virginia State Bar v. Douglas*, 179 W.Va. 490, 370 S.E.2d 325 (1988). *See also* W. Va. Rules of Professional Conduct Rule 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law[.]").

The lawsuit filed by Ms. Davis is a textbook example of a frivolous lawsuit. By prohibiting the circuit court in this case from imposing sanctions for the filing of such a meritless pleading, the majority opinion has left no room for trial courts to ever again impose Rule 11 sanctions. Attorneys who file frivolous lawsuits in the future can evade sanctions and disciplinary charges merely by citing to the majority's decision. Worse yet, the majority decision has no judicial support to challenge a universally accepted common law principle, which categorically *precludes* a negligence action by a convicted criminal defendant against expert witnesses who are testifying on behalf of the prosecution.[5] The

---

4. *See* Syl. pt. 1, *Bartles v. Hinkle*, 196 W.Va. 381, 472 S.E.2d 827 (1996).

5. Criminal defendants who are wrongfully prosecuted are not without remedy. A civil action lies for malicious prosecution. *See* Syl. pt. 3, in part, *McCammon v. Oldaker*, 205 W.Va. 24, 516 S.E.2d 38 (1999) ("To maintain an action for malicious prosecution it is essential to prove: (1) That the prosecution was malicious; (2) that it was without reasonable or probable cause; and (3) that it terminated favorably to plaintiff." (internal quotations and citation omitted)). Additionally, a

criminal action lies for perjury or subornation of perjury under W. Va.Code § 61–5–1 (1996) (Repl.Vol.2000), which states:

(a) Any person who is under an oath or affirmation which has been lawfully administered and who willfully testifies falsely regarding a material matter in a trial of any person, corporation or other legal entity for a felony, or before any grand jury which is considering a felony indictment, shall be guilty of the felony offense of perjury.

ultimate result of the majority's decision will almost certainly be the death knell for causes of action requiring the services of an expert witness, from medical malpractice and personal injury cases to abuse and neglect proceedings and criminal prosecutions.

## III. On the Horizon: Rough Waters Ahead

" 'A dissent in a court of last resort is an appeal to the brooding spirit of the law, to the intelligence of a future day, when a later decision may possibly correct the error into which the dissenting judge believes the court to have been betrayed.' " *Hunt v. Tucker*, 875 F.Supp. 1487, 1539 (N.D.Ala.1995) (Maddox, J., dissenting) (quoting *Auto–Owners Ins. Co. v. Hudson*, 547 So.2d 467, 469 (Ala. 1989) (Maddox J., dissenting) (quoting United States Supreme Court Chief Justice Charles Evans Hughes in William O. Douglas, *The Dissent: A Safeguard of Democracy*, 32 J. Am. Judicature Soc'y 104, 106 (1948))) (footnote omitted), *aff'd*, 93 F.3d 735 (11th Cir.1996). It goes without saying that the effect of the majority's decision in this case will be sweeping and profound. By giving criminal defendants carte blanche authority to sue the State's experts without impunity, the Court precariously navigates in heretofore uncharted waters, leaving countless expert witnesses to be tossed in the rough waters of their wake. I only hope that the Court has an opportunity to revisit this issue so that testifying experts can be spared from further peril. Realistically, however, I fear it will be some time before this State's litigants can once again enjoy smooth sailing.

For the foregoing reasons, I dissent. I am authorized to state that Justice Maynard joins me in this dissenting opinion.

(b) Any person who induces or procures another person to testify falsely regarding a material matter in a trial of any person, corporation or other legal entity for a felony, or before any grand jury which is considering a felony indictment, shall be guilty of the felony offense of subornation of perjury.
*See also State v. Justice*, 130 W.Va. 662, 44 S.E.2d 859 (1947) (reviewing subornation of perjury conviction); Syl., in part, *State v. Lake*, 107 W.Va. 124, 147 S.E. 473 (1929) ("It is vital in a trial of an indictment for perjury that the evidence given ... in a former judicial proceeding and alleged to have been willfully false, should show that such evidence so given ... was materi-

STARCHER, Justice, concurring.

(Filed July 3, 2002)

I believe the majority opinion is correct in this case. Though artfully pled, it seems to me that the dissenting opinion is the one that has "missed the boat" on the underlying case. The unnecessarily harsh dissent is but a lengthy essay on the issue of whether there exists in West Virginia a cause of action for negligence or malpractice against forensic experts. The majority opinion clearly acknowledges that there is *not* a cause of action for suing an opposing party's expert witness in West Virginia, and there is absolutely no language in the majority opinion that advocates for the creation of such a claim.

At issue is whether the trial court abused his discretion by assessing $8,500.00 in sanctions against the appellant parties for promoting what the appellants perceived to be an advancement in our current law. The trial court properly determined that the theory of law propounded by the appellants does not support a cause of action in our State. However, the trial court also determined that the appellants were in violation of *West Virginia Rules of Civil Procedure*, Rule 11 [1998], and had a "vexatious, wanton, or oppressive intent to intimidate the appellees."

The majority merely acknowledges that there is an emerging body of case law and scholarly work that have begun to question the granting of absolute immunity to expert witnesses, often known in legal circles as "hired guns," for their in-court testimony and out-of-court preparations. Several law review articles and courts have begun to argue that it is not unreasonable to expect that

al to the issue involved in the trial."). Finally, a criminal action for false swearing is available under W. Va.Code § 61–5–2 (1923) (Repl.Vol. 2000), which provides:
To wilfully swear falsely, under oath or affirmation lawfully administered, in a trial of the witness or any other person for a felony, concerning a matter or thing not material, and on any occasion other than a trial for a felony, concerning any matter or thing material or not material, or to procure another person to do so, is false swearing and is a misdemeanor.
*See also State v. Wade*, 174 W.Va. 381, 327 S.E.2d 142 (1985) (affirming false swearing conviction).

expert witnesses should be held to standards of their profession both in and outside of the courtroom, and several jurisdictions have permitted such law suits. Considering the developing trend, the appellants' suit against the State's expert witnesses should not be seen as frivolous. Thus, this Court was within its authority to find that the trial court erred in levying sanctions.

*West Virginia Rules of Civil Procedure*, Rule 11(b) [1998], clearly permits a lawyer to urge "the extension, modification, or reversal of existing law or the establishment of a new law[.]" Lawyers should be praised for their innovations, even if their innovations run a little far afield. The law is an evolving entity—not a museum piece to be studied under glass. And, on occasion, what may be seen by some as a frivolous argument may become tomorrow's cutting-edge legal theory.

For all of the hand-wringing and complaints of the sky falling, what the dissenting opinion portends as "rough seas ahead" is actually a self-imposed, artificially-created tempest in a teapot.